# EXHIBIT 1

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI
TWENTY-FIRST JUDICIAL CIRCUIT

| | |
|---|---|
| SCRIP WORLD, LLC, a Utah Limited Liability Company, <br><br> Plaintiff, <br><br> vs. <br><br> EXPRESS SCRIPTS, INC., a Delaware corporation, <br> Serve at: Registered Agent <br> CSC Lawyers Incorporating Service Company <br> 221 Bolivar Street <br> Jefferson City, MO 65101 <br><br> Defendant. | Case No.: 12 SL- CC081 <br><br> Division No.: 10 <br><br><br><br><br><br><br><br><br><br> JURY TRIAL DEMANDED |

**PETITION FOR BREACH OF CONTRACT,
TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS
EXPECTANCY, UNFAIR COMPETITION AND DECLARATORY RELIEF**

COMES NOW Plaintiff Scrip World, LLC ("SW" or "Plaintiff"), by and through its undersigned counsel, and for its Petition against Defendant Express Scripts, Inc. ("ESI" or "Defendant"), states as follows:

### The Parties

1. Plaintiff SW is a Utah limited liability company whose sole member is Prodigy Health Group, Inc. ("Prodigy") and Prodigy is a Delaware corporation. SW offers prescription benefits management services throughout the United States and maintains its principal place of business at 4246 Riverboat Road, Suite 175, Salt Lake City, Utah 84123.

2. Upon information and belief, defendant ESI is a Delaware corporation offering prescription benefits management services throughout the United States, with its principal place of business at 13900 Riverport Drive, Maryland Heights, Missouri 63043.

NY995853.5
217558-10029


EXHIBIT 1

ESI is a publicly traded company with a market cap in excess of $24 billion and annual revenues that exceed $45 billion.

3. This Court has jurisdiction over this matter and venue is proper as Defendant maintains its headquarters in St. Louis County, Missouri and the contract which forms the basis for the claims in this lawsuit was entered in to in St. Louis County, Missouri.

## Allegations Common to All Counts

4. SW is a prescription benefits manager ("PBM") for companies across the country. PBMs design prescription drug plans, distribute medications and other health products on behalf of managed care plans, insurance companies and other health plan administrators and also provide services such as claims management and specialty pharmacy distribution. SW operates in conjunction with its sister company, Meritain Health, Inc. ("Meritain"), a third party administrator ("TPA"). Both companies are owned by Prodigy.

5. TPAs such as Meritain design and administer self-funded employee benefit plans on behalf of companies across the country. For Meritain's clients, the design and administration of the prescription drug program accompanying the health benefit plan is often handled by SW.

6. In order to provide low-cost prescriptions to its clients, SW maintains non-exclusive "private-label" contractual relationships with a number of PBM vendors to leverage additional buying power. Those private-label PBMs fill drug prescriptions and provide certain other administrative services for SW's clients. ESI is one of the largest of the private-label PBM vendors utilized by SW.

## The Prescription Drug Program Agreement

7. On August 8, 2005, SW and ESI entered into a private-label Prescription Drug Program Agreement ("PDPA") by which ESI agreed to provide prescription drug services to SW for the benefit of SW's clients. A copy of the PDPA is attached hereto as

Exhibit A and incorporated by reference. As part of the process of entering into the PDPA, SW necessarily disclosed to ESI its client list, the number of lives covered by each client, its business model and plans, and other proprietary information. Naturally, as the provider, ESI also has knowledge of SW's costs. The PDPA was advantageous to SW's clients because they were able to leverage SW's and ESI's bulk purchasing power. ESI represented to SW that the PDPA was advantageous to it because it expanded its client base for smaller clients which it could not otherwise serve.

8. The PDPA is non-exclusive, and SW has multiple similar relationships. Indeed, a key element of SW's business is its ability to analyze the specific needs of each of its clients and determine which of its PBM vendors provides the best value for each client in terms of service and cost.

### The Aetna Acquisition

9. In or around June 2011, Aetna, Inc. ("Aetna") acquired Prodigy. At the time of the acquisition and continuing through the present, Aetna was a party to a private-label PBM agreement with a third party PBM (the "Aetna Vendor"). SW had an existing private-label PBM agreement with the Aetna Vendor prior to the Aetna acquisition, but the pricing that SW had obtained was not very favorable. SW did not gain the benefit of Aetna's pricing with the Aetna Vendor as a result of the acquisition, and in fact SW has not become a party to that agreement. However, after the acquisition was completed, SW renegotiated its private-label agreement with the Aetna Vendor and has since gained more favorable pricing.

10. Prior to the Aetna acquisition, ESI served as the back-end, or private-label, PBM vendor for several of SW's clients. However, as a result of the renegotiated PBM private-label agreement with Aetna's preferred third-party vendor, SW examined all of its clients' situations and determined that certain of them – less than fifteen percent of SW's total client base – would obtain better pricing and be able to reduce their overall health plan costs to their members if they switched their back-end PBM vendor from ESI to the

Aetna Vendor. During the fall of 2011, SW approached those clients and advised them about the possibility of changing back-end PBM vendors to reduce prescription drug prices. Some of those clients, approximately ten percent of SW's client base, opted to change back-end PBM vendors.

### ESI's Attempts to Steal SW's Business

11. After learning that it was losing some of its SW business, ESI began a campaign to steal not only those clients from SW, but *all* of the clients for which ESI is still a back-end PBM vendor. It did so despite receiving assurances from SW that SW intended to keep ESI as a PBM in keeping with SW's insistence on providing its clients with a choice of vendors. As part of this campaign, ESI accessed SW's client list and, upon information and belief, contacted via letter *all* of the SW clients for which ESI serves as a back-end vendor. A true and correct copy of a few sample letters are attached hereto collectively as Exhibit B, and incorporated by reference. ESI also called and, in some cases, emailed, each of those clients and advised them, among other things:

- that ESI was aware of SW's pricing;
- that SW was not providing its clients with the best possible pricing; and,
- that if the client moved its business directly to ESI that ESI could save the client $8 per prescription.

12. ESI is contractually prohibited from disclosing SW's confidential and proprietary business information to third parties. Pursuant to section 5.2 of the PDPA:

> Each party agrees that information of the other party, including, but not limited to the following, shall constitute confidential and proprietary information ("Proprietary Information") unless otherwise voluntarily disclosed to the public: . . . (b) with respect to SW: SW information files, business operations and strategies. Neither party shall use the other's Proprietary Information or disclose it to any third

party, at any time during or after termination of this Agreement, except as specifically contemplated by this Agreement upon prior written consent.

13. SW's pricing, just like that of the third party vendor with whom SW renegotiated its contract after the Aetna acquisition, varies by client. It is dependent upon certain information files, business operations and strategies, including (a) SW's break-even point for purchasing prescription drugs; (b) the size of the client; (c) the design of the client's benefit plan; (d) the length of the contract; (e) the particular needs of each client; (f) the location of the client; (g) the number of lives or members covered by the plan; (h) historical data; (i) client contact information; (j) pricing margins; (k) information files; (l) business strategies; (m) operational information; and (n) past pricing models. Absent this and other Proprietary Information, price-specific proposals, including the one made by ESI about saving clients $8 per prescription, are not possible. Indeed, SW entered into the PDPA with ESI for the precise reason that, based upon the information files, business operations and strategies disclosed by SW to ESI, it was clear that SW, utilizing its expertise in plan design, could leverage the fulfillment and administrative resources of ESI to provide cost effective pharmacy benefit plans to its clients.

14. ESI was aware that the pricing proposals were based on SW's proprietary information at the time it began its campaign to poach SW's clients. In order to try to protect itself after having accessed and utilized SW's Proprietary Information to prepare the proposal and determine that it could charge $8 less per prescription, it emailed, concurrently with the pricing proposal, a form entitled Authorization to Use Claims Data to Prepare Price Quote ("Authorization"), which ESI requested that each SW client execute, which states:

> As a duly authorized representative of Employer with full

> authority to act on behalf of Employer, I hereby authorize Express Scripts, Inc. ("ESI") to use Employer's historical claims data residing in ESI's systems in order to prepare a price quote and proposal to provide pharmacy benefit management services to Employer and to assist Employer in analyzing potential cost savings associated with such offer. (A true and correct copy of a sample Authorization is attached hereto as Exhibit C and is incorporated by reference.)

15. The Authorization document also contains a clear indication that ESI was aware that contracts were in place between the client and SW and was trying to retroactively create a cover to protect ESI:

> Based on Employer's request to provide a proposal for ESI's provision of pharmacy benefit management services, ESI assumes that Employer has no conflicts, contractually or otherwise, that would prevent employer from engaging ESI as its pharmacy benefit manager.

## Count I

### Breach of Contract

16. SW hereby restates and re-alleges paragraphs 1 through 15 as if fully set out herein.

17. The PDPA constitutes a valid and enforceable agreement, supported by consideration, between SW and ESI.

18. The operation of the PDPA imposed specific contractual obligations on both SW and ESI.

19. SW has complied with all material obligations imposed on it by the PDPA,

which was in full force and effect at all times material to this litigation.

20. ESI has breached its contractual obligations under the PDPA by, among other things, improperly using SW's Proprietary Information concerning, among other things, SW's client lists, financial modeling and cost structure to solicit business directly from SW's existing clients at price points that it knew that SW was unable to match.

21. As a result of ESI's breaches of the PDPA, upon information and belief, SW has suffered and will continue to suffer substantial damages to be proven at trial.

WHEREFORE, SW respectfully requests that the Court:

(a) Enter judgment in favor of SW and against ESI for damages in an amount to be proven at trial, and for interest upon such amount at the highest rate allowable by law;

(b) award SW its reasonable attorneys' fees and costs herein expended; and

(c) order such other and further relief as the Honorable Court deems just and proper under the circumstances.

## Count II

### Tortious Interference with a Business Expectancy

22. SW restates and re-alleges paragraphs 1 through 21 as if fully set forth herein.

23. SW maintains valid contractual relationships and resultant business expectancies with an existing client base which it does not disclose publicly.

24. As SW's PBM vendor, ESI has actual knowledge of the existence of these contracts and the individual contacts at each client.

25. ESI has interfered with SW's contractual relationships with its third party clients by, among other things, disparaging SW by advising those clients that the pricing arrangements SW maintains with those clients are over-priced, and "undercutting" SW by offering PBM services directly to those clients at price rates that it knows SW is unable to

match, often at prices lower than those ESI is charging SW.

26. There is no justification for ESI's employment of improper means – the prohibited use of SW's Proprietary Information – to solicit business from SW's existing clients.

27. As a result of ESI's interference with SW's contracts and business expectancies, SW has suffered and will continue to suffer substantial damages in an amount to be proven at trial.

28. ESI's interference with SW's contracts and business expectancies has been, and is, intentional, willful, wanton and malicious, and an award of punitive damages is both necessary and appropriate to punish and deter ESI from like conduct in the future.

29. As a result of ESI's interference with SW's contracts and business expectancies, SW will, in addition to damages, suffer irreparable harm for which there is no adequate remedy at law.

WHEREFORE, SW respectfully requests that the Court:

(a) Enter a permanent injunction in its favor and against ESI, its officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, enjoining any communications, whether directly or indirectly, from ESI to any of SW's customers that rely on or otherwise make use of SW's Proprietary Information, as that term is defined in the PDPA, and requiring ESI to continue to perform under the terms of the PDPA until it expires or is terminated;

(b) enter judgment in favor of SW and against ESI, awarding it damages arising from ESI's tortious interference with SW's contracts and business expectancies;

(c) award SW punitive damages in an amount that will punish ESI for their wrongful acts and deter future acts of similar character;

(d) award SW its attorneys' fees and costs herein expended; and

(e) order such other and further relief as this Honorable Court deems just and proper under the circumstances.

## Count III

### Unfair Competition

30. SW restates and re-alleges paragraphs 1 through 29 as if fully set forth herein.

31. ESI's solicitation of SW's existing business by resort to Proprietary Information it is contractually prohibited from disclosing to third parties violates basic tenets of fair play.

32. SW has been, and will continue to be, harmed by such unfair conduct by ESI.

33. ESI's conduct has been and is intentional, willful, wanton and malicious, and an award of punitive damages is both necessary and appropriate to punish and deter ESI from like conduct in the future.

WHEREFORE, SW respectfully requests that the Court:

(a) Enter a permanent injunction in its favor and against ESI, its officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, enjoining any communications, whether directly or indirectly, from ESI to any of SW's customers that rely on or otherwise make use of SW's Proprietary Information, as that term is defined in the PDPA, and requiring ESI to continue to perform under the terms of the PDPA until it expires or is terminated;

(b) enter judgment in favor of SW and against ESI for damages in an amount to be proven at trial, and for interest upon such amount at the highest rate allowable by law;

(c) award SW punitive damages in an amount that will punish ESI for their wrongful acts and deter future acts of similar character;

(d) award SW its attorneys' fees and costs herein expended; and

(e) order such other and further relief as this Honorable Court deems

just and proper under the circumstance.

## Count IV

### Declaratory Relief

34. SW restates and re-alleges paragraphs 1 through 33 as if fully set forth herein.

35. The PDPA sets forth the respective rights and obligations of SW and ESI. Section 5.2 of the PDPA states, in pertinent part:

> Each party agrees that information of the other party, including, but not limited to the following, shall constitute confidential and proprietary information ("Proprietary Information") unless otherwise voluntarily disclosed to the public: . . . (b) with respect to SW: SW information files, business operations and strategies. Neither party shall use the other's Proprietary Information or disclose it to any third party, at any time during or after termination of this Agreement, except as specifically contemplated by this Agreement upon prior written consent.

36. ESI has violated section 5.2 of the PDPA by improperly disclosing SW's Proprietary Information to third parties.

37. A justiciable controversy exists with respect to ESI's obligations under, and breach of, the PDPA.

38. SW seeks a declaration from the Court that ESI is prohibited from communicating with SW's existing clients, if such communications contain or make use of SW's Proprietary Information, as that term is defined in the PDPA.

WHEREFORE, SW respectfully requests that the Court:

(a) Enter a declaratory judgment in its favor and against ESI declaring that:

        i)      ESI has breached the PDPA by improperly disclosing SW's proprietary information; and

        ii)      ESI is enjoined from any such further disclosure;

(b)      award SW its reasonable attorneys' fees and costs expended herein; and

(c)      order such other and further relief as the Court deems just and proper under the circumstances.

Dated: January 9, 2012

**JURY TRIAL DEMANDED**

Respectfully submitted,

SAUTER-SULLIVAN, LLC

By: _____
Kevin A. Sullivan, # 40735
3415 Hampton Avenue
St. Louis, Missouri 63139
Phone: (314) 768-6800
Fax:     (314) 781-2726
Email: ksullivan@ss-law.net

OF COUNSEL:
Daniel Platt
Loeb & Loeb, LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, California 90067
Phone: (310) 282-2110
Email: dplatt@loeb.com

*Attorneys for Plaintiff Scrip World, LLC*