EXHIBIT 2



Existing
ESI

## PRESCRIPTION DRUG PROGRAM AGREEMENT

THIS PRESCRIPTION DRUG PROGRAM AGREEMENT ("Agreement") entered into as of the Effective Date set forth on the signature page, by and among EXPRESS SCRIPTS, INC., a Delaware corporation, ("ESI"), EXPRESS SCRIPTS SENIOR CARE, INC. ("Senior Care") and SCRIP WORLD, LLC, a Utah limited liability corporation ("SW").

### RECITALS

A.   ESI provides pharmacy benefit management services such as pharmacy network management, formulary development, pharmacy claims processing, pharmacy trend and clinical programs and rebate contracting ("PBM Services") to employer groups, unions and other health plan clients.

B.   Senior Care, a wholly owned subsidiary of ESI, provides Medicare Part D support and reporting services for Qualified Retiree Prescription Drug Plans;

C.   SW desires to offer and provide the PBM Services under SW's name and marks, and to arrange for ESI to license to SW certain rights to market the PBM Services that will be supported by ESI, and to otherwise contract for ESI to provide the administration of the PBM Services to SW's Clients.

D.   ESI and SW have agreed to develop an arrangement whereby SW will "private label" the PBM Services and to provide for the financial terms and conditions for such services to SW Clients as more fully described in the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

### TERMS OF AGREEMENT

**ARTICLE I – DEFINITIONS**

The following terms shall have the meanings set forth below:

"Client" means an employer, union or self-insured health plan that has contracted with SW for PBM Services under a SW Client Agreement.

"Client Rate(s)" means the pharmacy reimbursement pricing and other administrative fees determined solely by SW to be billed to Clients as described in Section 4.1 herein.

"Client Set-Up Form" means a prescription drug benefit summary form ESI has provided to SW which, when completed by SW for each Client will describe the essential features adopted by the Client for the prescription drug components of the Client's Plan(s).

"Copayment" means that portion of the charge for each Covered Drug dispensed to a Member that is the responsibility of the Member as indicated in the applicable Client Set-Up Form (which amount also may be characterized as coinsurance).

"Covered Drug(s)" means those prescription drugs, supplies, Specialty Products and other items that are covered under by a Client's Plan, each as indicated in the applicable Client Set-Up Form.

"Deductible" means the aggregate annual amount the Member is required to pay for Covered Drugs before becoming entitled to the benefits under a Client's Plan as indicated in the applicable Client Set-Up Form.

102484v5
Final
WDC - 73539/0630 - 2155819 v1





"Eligibility Files" means the list submitted by SW to ESI in reasonably acceptable on-line, FTP, or electronic format indicating persons eligible for drug benefit coverage services under each Client. Updates performed manually by ESI on behalf of SW shall be subject to additional charges as set forth in Exhibit A.

"ERISA" means the Employee Retirement Income Security Act, as amended, 29 U.S.C. §1001 et seq.

"ESI Specialty Pharmacy" means CuraScript Pharmacy, Inc. or another pharmacy wholly-owned or operated by ESI or its wholly-owned subsidiaries that primarily dispenses Specialty Products. For purposes of this Agreement, the ESI Specialty Pharmacy is not considered a Mail Service Pharmacy.

"Formulary" means a list of FDA-approved prescription drugs and supplies classified for purposes of benefit design and coverage decisions.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended.

"ID Card" means a printed identification card identifying, among other things, that ESI is the claims processor for the Prescription Drug Claims and the contact information for Member call center information. The ID Card shall be developed by ESI and SW in a mutually acceptable form; provided that ESI's form ID Card shall conform to the NCPDP standard format.

"Implementation SOW" means the Implementation Statement of Work, which is a form completed and signed by SW or a Client prior to implementation of a Client that contains the material elements of the Client's Set-up Form, including processing fields, indemnity and termination rules, file layout and alternative ID numbers, etc.

"Mail Service Pharmacy" means a duly licensed pharmacy owned, operated or subcontracted by ESI or its subsidiaries, other than ESI Specialty Pharmacy, where prescriptions are filled and delivered to Members via the United States Postal Service, DHL or other delivery service.

"Manufacturer Administrative Fees" means those administrative fees paid by pharmaceutical manufacturers to, or otherwise retained by, ESI pursuant to a contract between ESI and the manufacturer and directly in connection with ESI's administering, invoicing, allocating and collecting the Rebates relating to Client utilization.

"Member" means each person who is eligible to receive prescription drug benefits under a Client's Plan as indicated in the Eligibility Files.

"Member Submitted Claim" means (a) a claim submitted by a Member, or his designated representative, for Covered Drugs dispensed by a pharmacy other than a Participating Pharmacy or Pharmacy; (b) a claim submitted by a member, or his designated representative, for Covered Drugs filled at a Participating Pharmacy for which the Member paid cash; or (iii) subrogation claims submitted by the United States or any state under Medicaid or similar government health care programs.

"Participating Pharmacy" means any licensed retail pharmacy with which ESI or SW has executed an agreement to provide Covered Drugs to Members.

"Pharmacy" or "Pharmacies" refers from time to time to any or all Participating Pharmacies, Mail Service Pharmacy, or ESI Specialty Pharmacy as the context of the provision dictates.

"Plan" means an employer or union sponsored prescription drug plan administered by SW's Clients, which includes the prescription drug benefits specified on the Client Set-Up Form.

"Prescription Drug Claim" means a Member Submitted Claim or claim for payment of a Covered Drug submitted to ESI by a Pharmacy.

"Protected Health Information" and "PHI" shall have the meaning set forth under HIPAA.

"QR-PDP" means a Qualified Retiree Prescription Drug Plan as defined under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("Medicare Drug Act").

"Rebates" means retrospective rebates that are paid to ESI, or otherwise retained by ESI, pursuant to the terms of a rebate contract negotiated independently by ESI with a pharmaceutical manufacturer, and directly attributable to the utilization of certain pharmaceuticals by Members. Rebates do not include Manufacturer Administrative Fees, or product discounts or similar remuneration received by subsidiary pharmacies of ESI.

"Specialty Products" means those biotech prescription drug products requiring special handling and Member services, including, but not limited to, those Specialty Products listed in the Specialty Product section of Exhibit A (as that list is periodically modified in accordance with Exhibit A from time to time).

"SW Client Agreement" means a written agreement between a Client and SW for the provision of PBM Services.

"SW Rates" means the pharmacy reimbursement rates charged by ESI to SW as set forth in Exhibit A. The SW Rates may be different from the Client Rates for which SW contracts with its Clients.

"UM Company" means an independent, third party utilization management company with which ESI contracts to provide appeal services at Client's option as further described in Section 3.2(e).

## ARTICLE II - ESTABLISHMENT OF THE PRESCRIPTION DRUG PROGRAM

2.1 Eligibility/Set Up. (a) ESI shall implement the Eligibility Files in accordance with the Implementation SOW. Any changes to the Implementation SOW must be documented on ESI's form of amendment to such form and signed by SW prior to the effective date of these changes. ESI shall provide SW, via on-line or other agreed upon medium, load summary reports detailing Eligibility File Statistics after each eligibility load. SW shall be responsible for validating eligibility loads and correcting rejected, erred and termed by absence Member records. Clean changes only files shall be loaded within one (1) business day, however if the eligibility file meets a fault tolerance threshold agreed to between ESI and SW, the file will be held until such time as ESI and SW can correct and apply accurately. The timing of loading full Eligibility Files will be determined upon consultation with SW. SW shall provide full Eligibility Files for term by absence reconciliation and authorize ESI to apply the terminations or otherwise agree to provide termination dates for all ineligible Members. ESI shall not be responsible for Prescription Drug Claims for retroactively termed Members. SW shall be responsible for all Prescription Drug Claims during the period of the Member's eligibility as indicated on the Eligibility File, except in the event of ESI's negligence.

(b) Prior to the provision of any services by ESI under this Agreement, SW will submit a completed Client Set-Up Form certifying that the Client Set-Up Form accurately depicts the pharmacy benefit provisions of the Client's Plan. ESI shall have no responsibility to communicate the terms of and changes to the Plan to its Members prior to the effective date of such provisions. ESI shall notify SW as soon as is practicable, and prior to the effective date of such change, of any material changes to the Specialty Product list, or to the Formulary chosen by Client. SW shall notify ESI in the event of change to benefit design features of a Client's Plan after initial setup, including but not limited to changes in Copayments, Covered Drugs, or prior authorization requirements in writing, via ESI's standard benefit change forms. New Client Set-Up Forms, changes to Client Set-Up Forms, and Client terminations shall be processed by ESI and shall be made effective within 3 business days.

## ARTICLE III - PBM SERVICES

3.1  Pharmacy Network Management.

(a)  Participating Pharmacies. ESI shall maintain a network of Participating Pharmacies to serve Members. ESI will make available an updated list of Participating Pharmacies in such network(s) on-line. ESI shall provide written notice to SW of changes to the network that materially affect the access of Members to Participating Pharmacies, with such notice being provided as soon as practicable and in any event at least 15 business days prior to the effective date of any such change. ESI shall ensure that each Participating Pharmacy is required to verify the Member's eligibility through ESI's on-line claims processing system. ESI shall provide to each Participating Pharmacy through its on-line system a real-time accurate list of all Covered Drugs, and shall direct each Participating Pharmacy to charge and collect from Members the applicable Copayment and/or Deductible for each Covered Drug dispensed.

(i)  Requirements for Participation. ESI shall require each Participating Pharmacy to meet ESI's participation requirements, including but not limited to licensure, insurance and provider agreement requirements, and SW agrees that its contracts with licensed retail pharmacies shall contain all such reasonable requirements. ESI does not direct or exercise any control over the professional judgment exercised by any pharmacist in dispensing prescriptions or otherwise providing pharmaceutical related services at a Participating Pharmacy. A copy of ESI's standard form Participating Pharmacy provider agreement is attached hereto as Exhibit H. Participating Pharmacies are independent contractors of ESI, and except as otherwise provided herein, neither ESI nor SW shall have liability to the other or to any Client or Member or any other person or entity for any act or omission of any Participating Pharmacy or its agents or employees. ESI does agree to be responsible for the acts or omissions of the Mail Service and ESI Specialty Pharmacies.

(ii)  Audits of Participating Pharmacies. ESI shall audit Participating Pharmacies to determine compliance with their provider agreements with ESI. The audit may be conducted by ESI's internal auditors or its outside auditors, and at the pharmacy or at ESI by a review of electronically transmitted claims in accordance with ESI pharmacy audit protocols. ESI performs on site audits of 3% of its Participating Pharmacies filling more than 250 Prescription Drug Claims the previous year, on an annual basis. In addition, daily and desk audits of the previous day's submitted Prescription Drug Claims are audited on a continuous basis. ESI will provide SW a list of all audited Prescription Drug Claims with a recovery for the previous month on the last billing invoice of the month. The invoice information will include the reversal of the original Prescription Drug Claims, the corrected Prescription Drug Claims if appropriate, the amount of the recovery and the amount of the applicable audit fee. Collection from the Participating Pharmacy will be by means of reversal of the incorrect Prescription Drug Claims or offsets against future payments. ESI shall attempt recovery of identified overpayments through offset, demand or other reasonable means. ESI agrees to notify SW of any provider with a recovery amount for its claims in excess of $1,000.00 that has been deemed uncollectible. SW may choose to pursue collection efforts against the provider if so desired. To compensate ESI for the cost of conducting such audits, ESI shall retain an audit fee in the amount set forth in Exhibit A from any recovered overpayment attributable to a Client. The amount of the overpayment will be the difference between the submitted rate and corrected claim rate based on the lesser of the discounted AWP for SW or submitted U&C pricing. Any balance of recovered overpayments will be paid to SW and SW shall be responsible for the return of any such amounts to Clients as provided in the SW Client Agreement.

(b)  Mail Service Pharmacy. Members may have prescriptions filled through the Mail Service Pharmacy. If requested to by SW, and subject to applicable law, ESI shall communicate with Members regarding benefit design, cost savings, availability, and use of the Mail Service Pharmacy. . If the prescription and applicable law do not prohibit substitution of a generic drug equivalent to the prescribed brand drug, or if the Mail Service Pharmacy obtains the consent of the prescriber, the Mail Service

Pharmacy shall dispense the generic drug substitute to the Member. The determination of the circumstances in which applicable law authorizes substitution of generic drugs, and whether consent of the prescriber has been obtained, shall be solely the responsibility of the Mail Service Pharmacy, and SW shall have no liability to any Client or Member or any other person or entity in connection with any decision relating to the substitution of generic drugs for a prescribed brand drug. The Mail Service Pharmacy shall charge, and Members shall pay, the applicable Copayment and/or Deductible prior to the dispensing of a prescription through the Mail Service Pharmacy.

(c) Specialty Products. Members may have Specialty Products filled through ESI Specialty Pharmacy and/or Participating Pharmacies as described on Exhibit A.

(d) Pharmacy Help Desk. ESI will provide 24-hour a day, 7-days a week toll-free telephone support and Internet web site to assist Participating Pharmacies with Member eligibility verification and questions regarding reimbursement, Covered Drugs under a Client's Plan, or other related concerns.

3.2 Claims Processing.

(a) On-Line Claims Processing. ESI will perform claims processing services for Covered Drugs dispensed by a Pharmacy in accordance with the HIPAA transaction standards for such functions, and shall (i) verify eligibility, Formulary inclusion, utilization history and benefit design; (ii) perform drug utilization review ("DUR"); (iii) calculate benefits in accordance with the Client Set-Up Form; and (iv) adjudicate the claims. In all cases, the Client shall have the final responsibility for all decisions with respect to coverage of a Prescription Drug Claim and the benefits allowable under the Client's Plan, including determining whether any rejected or disputed claim shall be allowed, unless the Client has elected, pursuant to Section 3.2(e) to have such decisions made by the UM Company. ESI shall not conduct appeals.

(b) Member Submitted Claims. If elected by SW on the Client Set-Up Form, ESI shall process Member Submitted Claims for Clients for the fee set forth on Exhibit A. The Member (or Medicaid agency, as the case may be) shall be responsible for submitting such claims directly to ESI, on a form approved by ESI, within the time period set forth on the Client Set-Up Form.

(c) DUR. ESI shall perform a standard concurrent DUR analysis of each prescription submitted for processing on-line by a Pharmacy in order to assist the dispensing pharmacist and prescribing physician in identifying potential drug interactions, incorrect prescriptions or dosages, and certain other circumstances that may be indicative of inappropriate prescription drug usage. ESI's DUR processes are not intended to substitute for the professional judgment of the prescriber, the dispensing pharmacist or any other health care professional providing services to the Member. Neither SW nor ESI will be liable for any damages arising from the use, or lack of use of the DUR process by Pharmacies or physicians except that ESI shall be responsible for proper maintenance and updates of the DUR system and processes. Nothing in this Section shall operate to relieve ESI of the customary professional obligations of the dispensing pharmacists at its Mail Service or ESI Specialty Pharmacies.

(d) Prior Authorization. ESI shall provide prior authorization ("PA") services for the fees set forth on Exhibit A, including exception reviews and overrides for quantity limits, nonformulary determinations, and benefit exclusions as specified and directed by Client for drugs designated on the Client Set-Up Form. Prior authorized drugs must meet Client-approved guidelines ("Guidelines") before they are deemed to be Covered Drugs. ESI shall provide to Client its applicable Guidelines in connection with Covered Drugs that Client has specified for prior authorization, and ESI shall not conduct prior authorization on any such Covered Drug unless Client has approved the applicable Guideline. To the extent ESI materially changes a Guideline for a Covered Drug identified for prior authorization, it shall provide the revised Guideline to the Client for approval prior to implementation of such revised Guideline. The Client shall either authorize coverage for an otherwise excluded use in the event of co-morbidities, complications and other factors not otherwise expressly set forth in the Guidelines, or direct that it be provided such issue for determination. SW acknowledges, and shall incorporate in the SW Client Agreement, that (i) PA programs are based on objective criteria and a limited amount of patient

information available to ESI, (ii) in determining whether to authorize coverage of such drug under the PA Program, ESI shall apply only the Guidelines and may rely entirely upon information about the Member and the diagnosis of the Member's condition provided to it from sources deemed reliable to ESI, and (iii) ESI shall not undertake, and is not required hereunder, to determine medical necessity to make diagnoses or substitute ESI's judgment for the professional judgment and responsibility of the physician.

(e) Claims for Benefits.

(i) Processing. ESI agrees that for a Client subject to ERISA, the processing of initial Member Submitted Claims and PA requests shall be conducted in a manner consistent with the requirements for claim processing set forth in 29 CFR Part 2560 (as published in the Federal Register, November 21, 2000), and any amendments thereto, except that Client shall be responsible for ensuring compliance with any aspect of the requirements relating to functions performed or materials prepared by Client or any other third party.

(ii) Appeals. ESI will not conduct any appeals of denied "claims for benefits." If a Client does not desire to conduct appeals itself, such Client may elect to have ESI facilitate appeals through the UM Company (for as long as ESI has a contract with a UM Company) for the fees set forth in Exhibit A and upon execution of the MCMC Appeal Election form substantially as set forth in Exhibit F. ESI will route to UM Company Member appeals properly sent to ESI's designated address. The UM Company will be responsible for conducting the appeal on behalf of Client in accordance with applicable law, and if an appeal is denied, the UM Company will be responsible for sending a denial letter to the Member in accordance with applicable law. ESI represents that it contractually requires the UM Company to agree that (X) it will conduct appeals in accordance with applicable law and Client's plan; (Y) it will indemnify and hold Client harmless from all judgments, settlements, awards and costs incurred by Client in connection with any proceedings with respect to which Client is made a party and it is determined in the context of such proceedings that such amounts incurred by Client are the result of UM Company's negligence or violation of the contract between ESI and UM Company. In addition, the contract between ESI and UM Company states that plan sponsors using UM Company's services pursuant to the contract will have third party beneficiary rights to enforce the indemnification provision described in the preceding sentence.

(f) Call Center. ESI will provide 24-hours a day, 7-days a week toll-free telephone, IVR and Internet support to assist SW, Clients, and Members with Member eligibility and benefits verification, Covered Drug questions, location of Participating Pharmacies and other related Member concerns.

3.3 Formulary Support.

(a) Formulary Development. ESI shall maintain an independent pharmacy and therapeutics committee (P&T Committee) that will develop and maintain the ESI National Preferred Formulary for use by Clients. ESI agrees that at the request of SW it will make available to Clients other Formularies that it maintains, and further agrees to negotiate in good faith with SW for customized Formularies that will be offered to Clients on a case by case basis. Prior to making any change in the ESI National Preferred Formulary, or any other Formulary that ESI and SW have made available to Clients, ESI shall provide advance notice in writing to SW. In addition, ESI agrees that SW may meet semi-annually with a clinical program manager to discuss formulary development, ask questions respecting Formulary design, and suggest changes to the ESI National Preferred Formulary or any other Formulary that has been made available to Clients. Minutes of the ESI P&T Committee are available on ESI's website.

(b) Clinical Programs. Upon written election of SW, ESI may provide clinical programs identified on Exhibit A, or such other programs as ESI may introduce from time to time, some of which may require payment of additional fees. ESI may change or discontinue clinical programs at its discretion, but not without advance notice to SW. ESI is expressly permitted to contact Members, Members' physicians, SW and its case managers and Pharmacies to perform the services provided by ESI hereunder.

(c) <u>Rebate Program</u>. ESI has taken Rebates into account in establishing the SW Rates, as set forth on <u>Exhibit A</u> and adjusted as set forth on <u>Exhibit B</u>.

3.4 <u>Program Operations</u>.

(a) <u>Program Reporting</u>. ESI shall make available to SW ESI's on-line standard management information reporting applications. At the request of SW, ESI or its wholly-owned subsidiaries may develop special reporting packages at ESI's standard hourly rate for such services, as set forth in <u>Exhibit A</u>.

(b) <u>Claims Data Feeds</u>. ESI shall provide a Client's prescription claims data in ESI's standard format(s) for no additional charge to SW for disease management, flexible savings account, health reimbursement account, health savings account, analytical, audit, and other "payment," "treatment" and "healthcare operations" purposes (as defined under HIPAA). ESI agrees to maintain claims data in a data warehouse for up to twenty-seven (27) months from the date the prescription is filled. Requests for retrieval of data beyond twenty-seven (27) months are subject to the hourly charge as set forth in <u>Exhibit A</u>. ESI disclaims any liability or responsibility to SW or a Client related to the disclosure to, and use of such claims data.

(c) <u>De-Identified Claims Data</u>. SW grants ESI permission, and shall include a similar statement in the SW Client Agreement permitting ESI, to use both during and after the term of this Agreement (and the SW Client Agreement) and/or transfer to third parties the anonymized PHI (de-identified in accordance with HIPAA) drug and related medical data collected by ESI or provided to ESI by SW and Clients <u>for research, provider profiling and other databases for benchmarking, drug trend, cost analyses, cost comparisons or other business purposes of ESI</u>. ESI shall retain full ownership rights over all compilations, analyses and reports prepared by ESI other than those reports prepared specifically for SW under this Agreement. Other than as necessary for Rebate filing, ESI does not transfer any claims data to pharmaceutical manufacturers. De-identified data is sold to industry market data aggregators such as IMS Health and NDC. Neither SW nor Client has any responsibility or shall have any liability in connection with ESI's de-identification of drug and related medical data or the transfer to or use of such data by any transferee.

(d) <u>Claims Data Retention</u>. ESI will maintain Client claims data supporting invoices for Covered Drugs adjudicated by ESI during the term of this Agreement for a period of twenty-four (24) months from the date the claim was incurred in their original forms, and thereafter on microfilm, microfiche or other form determined by ESI for an additional five (5) years. ESI shall use reasonable efforts to cooperate with SW for purposes of meeting SW's retention obligations under applicable law; provided that after expiration of the retention period provided herein, ESI shall dispose of such data in accordance with its standard policies and practices and applicable state and federal law.

(e) <u>SW Audits</u>. Provided that this Agreement has been duly executed by SW and SW's account does not reflect a delinquent balance with ESI at the commencement of or during an audit, SW may audit the prescription management services provided under this Agreement consistent with the Audit Protocol set forth in <u>Exhibit C</u> once per twelve (12) month period; provided, however, that upon reasonable cause to which both parties agree (including but not limited to SW's reasonable belief that the SW rates, including application of the Brand Guarantee, was not properly applied or that monies are otherwise owed SW), SW may undertake an audit more than once during such twelve (12) month period. Such audit right shall remain in effect for up to sixteen (16) months subsequent to the termination of this Agreement and applicable run-out period. Since the terms and conditions set forth in the SW Client Agreement are the proper subject of Client audits, Clients will not be permitted to audit ESI and such prohibition shall be incorporated into the SW Client Agreement; provided that ESI shall provide reasonable cooperation and documentation to SW in support of its Client's audits of SW. ESI agrees, however, that SW is free to share with the Client any results of any audit of ESI conducted pursuant to the rights under this Agreement. SW shall bear its own costs associated with any audit of ESI. SW may use an independent auditor ("Auditor"), so long as such auditor does not have a conflict of interest with ESI,

(e.g., Auditor serves as expert witness in litigation against ESI). If SW selects an Auditor that also has been appointed by ESI's shareholders to conduct the independent audit of ESI, then such firm must provide to ESI a letter stating that such engagement performed on behalf of SW shall in no way infringe upon said firm's independence with respect to ESI's audit. Such letter must be signed by the audit firm and approved by the engagement audit partner performing the ESI audit. Auditors must execute a mutually acceptable standard confidentiality agreement with ESI prior to commencement of the audit. Any requests by SW to permit an Auditor to perform an audit shall constitute SW's direction and authorization to ESI to disclose PHI to the Auditor. Except as otherwise provided in Exhibit C, audit materials and documentation provided by ESI will be limited to SW and Client-specific information. Contractual Information (e.g., reimbursement rates, fees and acquisition costs) concerning Pharmacies and other providers of products and services, which is proprietary and confidential to ESI, will not be disclosed to SW or Auditor.

(f) Cooperation and Assistance. Upon SW or Client request, ESI shall provide utilization data that it has in its systems to SW or Client to enable SW or Client to file claims under any class action or similar type of settlement concerning prescription drugs for which a payor may recover funds. ESI shall not be required to notify SW or Clients of any third party or class action legal actions or settlements concerning Covered Drugs, nor shall ESI represent SW or Client or file claims on behalf of SW or Clients in connection with such matters. In the event a manufacturer elects to reimburse payors in connection with a recall or similar activity through ESI or ESI Mail or Specialty Pharmacies, SW shall be entitled to receive, on a timely basis, its pro-rata share of any such distribution in accordance with ESI's policies and procedures relating to the distribution of such reimbursements.

(g) Liability Insurance. Each party shall maintain such policies of general liability, professional liability and other insurance of the types and in amounts customarily carried by their respective businesses. Proof of such insurance shall be available upon request. ESI agrees, at its sole expense, to maintain during the term of this Agreement or any renewal hereof, commercial general liability insurance, managed care and pharmacists professional liability insurance for the Mail Service and ESI Specialty Pharmacies, and managed care liability with limits, excess of a self insured retention, in amounts of not less than $2,500,000 per occurrence, and in the aggregate at least $5,000,000. ESI does not maintain liability insurance on behalf of any Participating Pharmacy, but does contractually require such pharmacies to maintain a minimum amount of commercial liability insurance or, when deemed acceptable by ESI, to have in place a self-insurance program.

## ARTICLE IV - FEES; BILLING AND PAYMENT

4.1 Billing and Payments. Subject to the provisions in Section 4.1(b) and (c), the parties agree as follows:

(a) Billing. Based on the SW Rates set forth on Exhibit A, ESI will bill SW every fourteen (14) days for:

(i) an estimate of the amount of the reimbursement for Covered Drugs dispensed by the Pharmacies, and, if applicable, for Member Submitted Claims, less applicable Copayments and/or Deductibles ("Claims Reimbursement"); and

(ii) for all other applicable administrative fees (such Claims Reimbursement and administrative fees to be referred to collectively as "Fees").

ESI shall calculate the estimate based on an approximation of the amounts owed by looking to the previous invoice period. ESI will perform a true-up reconciliation comparing the estimated invoiced amounts with the actual at each month end. The difference, either credit or underpayment, shall be applied to the next billing cycle.

(b) Payment Method. SW agrees to pay all invoiced Fees to ESI by wire or ACH transfer, debit or other electronic method within five (5) business days from the date of SW's receipt of the ESI

Invoice. SW agrees to pay the SW Rates to ESI notwithstanding the Client Rates that it elects to charge its Clients. SW shall be responsible for all costs of collection, and agrees to reimburse ESI for such costs and expenses, including reasonable attorneys' fees. Any amounts not paid by the due date thereof shall bear interest at the rate of prime lending rate as published by *The Wall Street Journal* plus two percent (2%) per annum. If SW disputes any item on any invoice, SW shall state the amount in dispute in writing within thirty (30) days of the date of the invoice. SW shall pay the full amount invoiced and shall notify ESI of the disputed amount.

(c) Deposit. SW acknowledges that ESI's agreements with the Participating Pharmacies require ESI to pay such pharmacies whether or not ESI's clients pay ESI. Further, such agreements expressly prohibit Participating Pharmacies from demanding payment from ESI's clients. Accordingly, and in consideration for the credit risk that ESI bears in providing the PBM Services, SW shall pay to ESI a deposit in four (4) consecutive equal installments of $250,000, to be paid at the same time as payment of the estimated invoice amounts, beginning with the first invoice payment, for a maximum deposit of $1,000,000 ("Deposit"). In the event that (i) SW is delinquent in payment of the SW Rates and Fees for two (2) consecutive estimated billing cycles, or (ii) fails to pay ESI after notice as provided in Section 7.2(c), ESI shall have the right to apply, dollar for dollar, amounts from the Deposit against the unpaid balances. ESI shall have the right to request SW contribute amounts to restore the Deposit to $1,000,000, and if SW declines, ESI shall have the right to unilaterally modify the billing and payment terms of Sections 4.1(a) and (b) or terminate this Agreement pursuant to Article 7. ESI shall retain the Deposit until the termination of this Agreement, and it shall be returned immediately following the conclusion of any run-off period; provided that SW may request that ESI evaluate, after twelve (12) consecutive months of timely payments of all SW Rates and Fees, that the Deposit may be reduced or eliminated. The decision to reduce or eliminate the Deposit shall be solely in the discretion of ESI. In any event, ESI may apply the deposit to unpaid balances of Fees until return of the Deposit.

(d) Client Rates. ESI acknowledges that SW may contract with Clients for Client Rates which may be different in whole or in part from the SW Rates; provided that in no event shall SW modify the products on the MAC list for Client Rates. SW agrees to disclose to Clients in the SW Client Agreement the fact of the differential and SW shall be solely responsible for any impact such differential causes, including resulting zero balance due claims or amounts generated that are less than the SW Rate for a Prescription Drug Claim.

ARTICLE V – PHI; PROPRIETARY INFORMATION; LICENSE OF MARKS

5.1   HIPAA. The parties agree that as relates to use and disclosure of PHI, electronic transaction standards and security of electronic PHI under HIPAA, they are subject to the terms of the Business Associate Agreement set forth in Exhibit D.

5.2   Proprietary Information. Each party agrees that information of the other party, including, but not limited to the following, shall constitute confidential and proprietary information ("Proprietary Information") unless otherwise voluntarily disclosed to the public: (a) with respect to ESI: reporting and system applications, (web-based and other media), and system formats, databanks, clinical and formulary management operations and programs and manuals, information concerning Rebates, prescription drug evaluation criteria, drug choice management, drug pricing information, and Participating Pharmacy agreements; and (b) with respect to SW: SW information files, business operations and strategies. Neither party shall use the other's Proprietary Information or disclose it to any third party, at any time during or after termination of this Agreement, except as specifically contemplated by this Agreement or upon prior written consent. Upon termination of this Agreement, each party shall cease using the other's Proprietary Information, and all such information shall be returned or destroyed upon the owner's direction.

5.3   License to Market ESI PBM Services. ESI grants to SW a non-exclusive, non-assignable and non-transferable license to use the ESI Marks as set forth on Exhibit G.
ARTICLE VI - COMPLIANCE WITH LAW; ERISA; FINANCIAL DISCLOSURE

6.1     Compliance with Law; Change in Law.

(a)     Each party shall be responsible for ensuring its compliance with any laws and regulations applicable to its business, including maintaining any necessary licenses and permits. SW (or Clients, as applicable) shall be responsible for any governmental or regulatory charges and taxes imposed upon the services provided hereunder, other than taxes based on the net income of ESI. If the scope of ESI's duties under this Agreement is made materially more burdensome or expensive due to a change in federal, state or local laws or regulations or the interpretation thereof, (e.g., ERISA requirements applicable to self-funded plans, third party administration requirements) the parties shall negotiate an appropriate modification of the services and/or an adjustment to the fees paid to ESI. If thereafter, the parties cannot agree on a modification or adjusted fee or SW otherwise does not agree with the modification to Participating Pharmacy rates, then either party may terminate the Agreement on ninety (90) days' prior written notice to the other.

(b)     The parties acknowledge the existence of laws in Maine and the District of Columbia that would require a party providing pharmacy benefit management services in those jurisdictions to be a fiduciary in the provision of those services. ESI shall not provide services to Clients located in Maine and the District of Columbia unless and until the laws in those jurisdictions are repealed, permanently enjoined from enforcement or otherwise found violative of state or federal law. ESI and SW agree to continually evaluate the situations in those jurisdictions to determine if and to the extent SW may serve those clients with ESI. In addition, certain states (e.g., South Dakota and North Dakota) presently require specific disclosures of financial terms, including Rebates and Manufacturer Administrative Fees to Clients that may be subject to those laws. Further, the South Dakota Division of Insurance is required to promulgate rules to implement the disclosure obligations of the South Dakota statute and as of the date of this Agreement has not adopted such rules. Given the uncertainty of the application of the South Dakota and North Dakota laws and regulations (and any other states considering such provisions) to Clients, ESI and SW agree to negotiate whether and the extent to which SW may contract with Clients in North Dakota, and South Dakota and any other states adopting similar provisions.

6.2     ERISA.  With respect to any Client whose Plan is regulated by the provisions of ERISA, SW agrees that its activities in regard to such Plan are in compliance with ERISA. SW acknowledges and agrees that neither it, nor any affiliate, shall serve as the "administrator" of any Plan, as that term is defined in section 3 of ERISA, and that it or its Clients are responsible for disclosing to Members any and all information relating to the Client's Plan as required by law to be disclosed. In providing services under this Agreement, SW acknowledges and agrees, and shall incorporate into the SW Client Agreement that the Client agrees, that neither ESI nor any of ESI's wholly-owned subsidiaries are acting on behalf of any employee welfare benefit plan (as defined in Section 3(1) of ERISA) or participants in such plans, or as a fiduciary (as defined in Section 3.21(a) of ERISA) of any Client or Client's Plan, and neither SW nor any Client shall name ESI or any of ESI's wholly-owned subsidiaries as a plan fiduciary. Neither ESI nor any of ESI's wholly-owned subsidiaries shall have any power to make any decisions as to Client drug benefits, policy, interpretations, practices or procedures, but rather provides administrative services for the drug benefit program within a framework of policies, interpretations, rules, practices, and procedures offered by SW and chosen by the Client. SW acknowledges, and shall incorporate into the SW Client Agreement that the Client agrees, that neither ESI nor any of ESI's wholly-owned subsidiaries have any discretionary authority or control respecting management of the prescription benefit program and does not exercise any authority or control respecting management or disposition of the assets of such program, if any exist. SW further acknowledges that all such discretionary authority is retained by the Client or some other person or entity designated by the client or the named fiduciary of the Plan.

6.3     Disclosure of Certain Financial Matters.  In addition to the SW Rates and applicable administrative fees paid to ESI by SW, ESI and ESI's wholly-owned subsidiaries may derive margin from fees and revenue in one or more of the ways as further described in the ESI Financial Disclosure to PBM Clients set forth in Exhibit E hereto ("Financial Disclosure"). In negotiating any of the fees and revenues described in the Financial Disclosure or in this Agreement, ESI and ESI's wholly-owned subsidiaries act on their own behalf, and not for the benefit of or as agents for SW, Clients or any Member. SW acknowledges and agrees that ESI and ESI's wholly-owned subsidiaries retain all interest, Manufacturer

Administrative Fees, revenues, any portion of Rebates, and all Participating Pharmacy discounts, if any, in addition to any administrative and other fees paid by SW. SW acknowledges that, except as may be expressly provided herein, SW does not have a right to receive, or possesses any beneficial interest in, any such discounts or payments, and agrees to include in the SW-Client Agreement an acknowledgement from the Client that neither it nor the client's Plan, nor its Members, have any legal or beneficial interest in, any such discounts or payments. .

ARTICLE VII - TERM AND TERMINATION; DEFAULT AND REMEDIES

7.1     Term. This Agreement will commence effective as of the later of (a) September 1, 2005, or (b) the date ten (10) days following execution of this Agreement by SW and ESI as set forth on the signature page ("Effective Date"), and shall continue for a period of the earlier of (i) three (3) year(s) from the Effective Date, or (ii) the processing of three million (3,000,000) Prescription Drug Claims ("Initial Term"), and may be terminated earlier or extended in accordance with the terms of Section 7.2 below. Thereafter, this Agreement shall automatically renew with the same terms and conditions as set forth herein for successive one (1) year renewal terms, subject to the right of termination as otherwise provided herein.

7.2     Termination.

(a)     Non-Renewal Upon Notice. Not less than one hundred eighty (180) days prior to the end of the Initial Term or any renewal term of this Agreement, either party may notify the other party in writing that it desires to terminate this Agreement effective as of the end of the then current term. Notwithstanding anything herein to the contrary, this Agreement shall not be terminated "without cause" prior to the expiration of the Initial Term.

(b)     Breach or Default. Either party may give the other written notice of a material, substantial and continuing breach of this Agreement. If the breaching party has not cured said breach within thirty (30) days from the date such notice was sent, this Agreement may be terminated at the option of the non-breaching party. If the amount of time commercially reasonable for the breach to be cured is longer than thirty (30) days, this Agreement may not be terminated by the non-breaching party pursuant to this provision until such commercially reasonable period of time has elapsed; provided, however, that in no event shall such period exceed sixty (60) days.

(c)     Non-Payment. Notwithstanding Section 7.2(a), ESI (and its wholly-owned subsidiaries) may terminate or suspend their performance hereunder and cease providing or authorizing provision of Covered Drugs to Members upon two (2) business days written notice if SW fails to pay ESI or provide the Deposit in accordance with the terms of this Agreement. ESI also may offset amounts overdue to ESI with other fees owed, if any, by SW to ESI. ESI may suspend Mail Service Pharmacy and/or ESI Specialty Pharmacy services to a Member who is in default of payment of any Copayments or Deductibles in the applicable pharmacy.

(d)     Insolvency; Regulatory Action. To the extent permitted by applicable law, ESI may terminate this Agreement, or suspend performance hereunder, upon the insolvency of SW, and SW may terminate this Agreement upon the insolvency of ESI. The "insolvency" of a party shall mean the filing of a petition commencing a voluntary or involuntary case (if such case is an involuntary case, then only if such case is not dismissed within sixty (60) days from the filing thereof) against such party under the United States Bankruptcy Code; a general assignment by such party for the benefit of creditors; the inability of such party to pay its debts as they become due; such party's seeking or consenting to, or acquiescence in, the appointment of any trustee, receiver or liquidation of it, or any material part of its property; or a proceeding under any state or federal agency declaration or imposition of receivership, composition, readjustment, liquidation, insolvency, dissolution, or like law or statute, which case or proceeding is not dismissed or vacated within sixty (60) days.

7.3     Remedies.

(a) Remedies Not Exclusive. A party's right to terminate this Agreement under Article VII shall not be exclusive of any other remedies available to the terminating party under this Agreement or otherwise, at law or in equity.

(b) Force Majeure. Neither party shall be liable in any manner for any delay to perform its obligations hereunder which are beyond a party's reasonable control, including, without limitation, any delay or failure due to strikes, labor disputes, riots, earthquakes, storms, floods or other extreme weather conditions, fires, explosions, embargoes, war or other outbreak of hostilities, government acts or regulations, or the failure or inability of carriers, suppliers, delivery services, or telecommunications providers to provide services necessary to enable a party to perform its obligations hereunder.

(c) Limitation of Liability. Except for the indemnification obligations set forth in Section 7.3(d), each party's liability to the other hereunder shall in no event exceed the actual proximate losses or damages caused by breach of this Agreement. In no event shall either party or any of their respective affiliates, directors, employees or agents, be liable for any indirect, special, incidental, consequential, exemplary or punitive damages, or any damages for lost profits relating to a relationship with a third party, however caused or arising, whether or not they have been informed of the possibility of their occurrence.

(d) Indemnification.

(I) In addition to any indemnification obligations set forth in the Business Associate Agreement, ESI will indemnify and hold SW, its officers, directors, employees and agents ("SW Indemnitees"), harmless from and against any losses, costs, damages, fees, awards, expenses or other liability, including, without limitation, reasonable costs and attorney fees and penalties, assessments, and taxes ("Costs") incurred in connection with any and all third party claims, suits, investigations (administrative, regulatory, or otherwise), arbitrations, proceedings, or enforcement actions, including claims of infringement of any intellectual property rights ("Claims") which may be asserted against, imposed upon or incurred by the SW Indemnitees and arising out of (A) ESI's negligent acts or omissions or willful misconduct, (B) ESI's breach of this Agreement, (C) any improper use or disclosure by ESI of PHI, or (D) SW's authorized use of ESI's Marks, or use of or access to any ESI proprietary reporting and system applications, unless SW has modified or altered such applications without ESI's written consent.

(II) SW will indemnify and hold ESI, its officers, directors, employees, and agents ("ESI Indemnitees") harmless from and against any Costs for Claims which may be asserted against, imposed upon or incurred by ESI Indemnitees and arising out of (A) SW's negligent acts or omissions or willful misconduct, (B) SW's breach of this Agreement, (C) any improper use by SW or an Auditor of PHI provided to such party, (D) SW's disclosure of the financial terms of this Agreement, the existence of Client Rates and the existence of SW Rates; or (D) ESI's authorized use of SW's Marks in connection with the services hereunder. In addition, SW's Client Agreements shall require that Client indemnify and hold ESI harmless from and against any Costs for Claims which may be asserted against, imposed upon or incurred by ESI that arise as a result of Client's benefit design and coverage decisions or any improper use Client, its auditors or its vendors may make of PHI provided to such party.

(III) As a condition of indemnification, the party seeking indemnification shall notify the indemnifying party in writing promptly upon learning of any Claim for which indemnification may be sought hereunder, and shall tender the defense of such claim to the indemnifying party. No party shall indemnify the other with respect to any Claim settled without the written consent of the other, which shall not be unreasonably withheld.

7.4 Obligations Upon Termination. SW shall pay ESI in accordance with this Agreement for all claims for Covered Drugs dispensed and services provided to SW and Members on or before the effective date of termination ("Termination Date"). Claims submitted by Participating Pharmacies or Member Submitted Claims filed with ESI after the Termination Date shall be processed and adjudicated in accordance with a mutually determined run-off plan, which shall not exceed twelve [12] months.

Notwithstanding the preceding, ESI may (a) delay payment of any amounts due SW, if any, to allow for any final adjustments, which shall not exceed twelve (12) months following the Termination Date, or (b) request that SW pay a reasonable deposit, which shall not exceed the prior two bi-monthly invoice periods, in the event ESI is requested to process after the Termination Date claims incurred on or prior to such date.

7.5     Survival.  The parties' rights and obligations under the last sentence of Sections 3.1(a),3.2(c), (d), (e) and (f); and Articles IV and V; and Sections 6.1, 6.2, 6.3, 7.3(a), (c) and (d), 7.4, and 7.5 shall survive the termination of this Agreement for any reason.

## ARTICLE VIII - MISCELLANEOUS

8.1     Notice.  Any notice or document required or permitted to be delivered pursuant to this Agreement must be in writing and shall be deemed to be effective upon mailing and must be either (a) deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, or (b) sent by recognized overnight delivery service, in either case properly addressed to the other party at the address set forth below, or at such other address as such party shall specify from time to time by written notice delivered in accordance herewith:

>               Express Scripts, Inc.
>               Attn: President
>               13900 Riverport Drive
>               Maryland Heights, Missouri 63043
>               Fax: 314-702-7120

With copy to:   General Counsel
                Fax: 314-702-7120

>               Scrip World, LLC
>               Attn: Douglas Burgoyne, President
>               50 West Broadway, Suite 1130
>               Salt Lake City, UT 84101
>               Fax: 801-936-0478

With copy to:   Performax, Inc.
                Attn: Donald B. Davis, Jr., Senior Vice President & General Counsel
                Tide Point
                1030 Hull Street
                Cascade Building, 2nd Floor
                Baltimore, MD 21230
                Fax: 410-986-3190

8.2     Independent Parties.  No provision of this Agreement is intended to create or shall be construed to create any relationship between ESI and SW other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  ESI shall not be referred to as the PBM of a Client in the SW Client Agreement.  Neither party, nor any of their respective representatives, shall be construed to be the partner, agent, fiduciary, employee, or representative of the other and neither party shall have the right to make any representations concerning the duties, obligations or services of the other that are inconsistent with, or in addition to those that are expressly set forth in this Agreement, or as otherwise authorized in writing by the party about which such representation is asserted.

8.3     Successors and Assigns.  This Agreement will be binding upon, and inure to the benefit of and be enforceable by, the respective successors and permitted assigns of the parties hereto; provided, however, that (a) this Agreement may not be assigned by SW without the prior written consent of ESI which consent shall not unreasonably be withheld after a standard credit evaluation, and (b) subject to

Section 8.10, ESI may assign certain of the services to be performed under this Agreement to its wholly-owned subsidiaries, as necessary to ensure proper performance of such services and may not assign (i) any of its duties, rights, and responsibilities under this Agreement, or (ii) responsibilities it has contracted with another party to provide as specified hereunder, to any party not otherwise identified in this Agreement without the express written consent of SW, which shall not be unreasonably withheld. ESI retains full responsibility and liability for the performance of such services by its wholly-owned subsidiaries.

8.4   Integration; Amendments. This Agreement and any Exhibits hereto that are incorporated in and are part of this Agreement constitute the entire understanding of the parties hereto and supersedes any prior oral or written communication between the parties with respect to the subject matter hereof. No modification, alteration, or waiver of any term, covenant, or condition of this Agreement shall be valid unless in writing and signed by both parties or the agents of the parties who are authorized in writing.

8.5   Choice of Law. This Agreement shall be construed and governed in all respects, except as may be preempted by federal law, according to the laws in the State of Missouri, without regard to the rules of conflict of laws thereof.

8.6   Waiver. The failure of either party to insist upon the strict observation or performance of this Agreement or to exercise any right or remedy shall not be construed as a waiver of any subsequent breach of this Agreement or impair or waive any available right or remedy.

8.7   Severability. In the event that any provision of this Agreement is invalid or unenforceable, such invalid or unenforceable provision shall not invalidate or affect the other provisions of this Agreement which shall remain in effect and be construed as if such provision were not a part hereof; provided that if the invalidation or unenforceability of such provision shall, in the opinion of either party to the Agreement, have a material effect on such party's rights or obligations under this Agreement, then the Agreement may be terminated by such party upon thirty (30) days written notice by such party to the other party.

8.8   Third Party Beneficiary Exclusion. This Agreement is not a third party beneficiary contract, nor shall this Agreement create any rights on behalf of Members as against ESI. SW and ESI reserve the right to amend, cancel or terminate this Agreement without notice to, or consent of, any Member.

8.9   Trademarks. Each party acknowledges each other party's sole and exclusive ownership of its respective trade names, commercial symbols, trademarks, and servicemarks, whether presently existing or later established (collectively "Marks"). No party shall use the other party's Marks in advertising or promotional materials or otherwise without the owner's prior written consent; provided, however, that the parties may publicize the fact that ESI provides prescription drug benefit management services under this Agreement with SW.

8.10   QR-PDP Subsidy Reports. (a) To the extent any Clients have elected to qualify and seek a subsidy in connection with their sponsorship of a QR-PDP, and timely notify SW of that election, SW shall identify the applicable QR-PDP Members to ESI.

(b) Senior Care shall be responsible for the preparation of Subsidy Reports, and the contracting, administration, allocation and collection of Rebate and Manufacturer Administrative Fees as relates solely to the eligible utilization of the QR-PDP Members. Senior Care shall provide to SW the Subsidy Reports in a format and content consistent with the requirements of the Medicare Drug Rules. In order for ESI to be able to prepare the Subsidy Reports, SW shall provide to Senior Care in a timely manner any elements and data now and hereafter required under the Medicare Drug Rules (e.g., Member social security numbers, the CMS issued Client Plan Sponsor ID and Application ID) in a format reasonably required by ESI.

(c) For purposes of this Section, "Subsidy Reports" means (i) monthly eligibility file (list of individuals believed to be enrolled as defined by the Medicare Drug Rules), and (ii) cost data extract

(gross covered retiree plan-related prescription drug costs) for monthly, quarterly, or annual reporting by for payment of the subsidy, in such a format and content as required under the Medicare Drug Rules.

IN WITNESS WHEREOF, the undersigned have executed this Prescription Drug Program Agreement as of the day and year below set forth.

| EXPRESS SCRIPTS, INC. | SCRIP WORLD, LLC |
|---|---|
| By: *[signature]* | By: *[signature]* |
| Printed Name: | Printed Name: Douglas S. Burgoyne |
| Title: | Title: PRESIDENT |
| Date: 8-8-05 | Phone: |
| | Fax: |
| Ed Ignaczak | Federal ID Number: |
| Sr. Vice President | |
| Sales & Account Management | Date: |
| Phone: 314-702-7169 | |
| Fax: 314-702-7055 | **RECEIVED AUG 0 4 2005** |

To be completed by Express Scripts, Inc.:

Effective Date: _____, 2005