UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MERITAIN HEALTH, INC., et. al<br><br>Plaintiffs,<br><br>vs.<br><br>EXPRESS SCRIPTS, INC.,<br>a Delaware corporation,<br><br>Defendant | Case No. 4:12-cv-00266-CEJ |

**EXPRESS SCRIPTS, INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant Express Scripts, Inc., ("ESI") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs' Amended Complaint.

## INTRODUCTION

This is a well-traveled lawsuit. It started in St. Louis County, with an action filed by Scrip World, LLC ("SW"). While a hearing was pending on SW's request for injunctive relief, SW suddenly dismissed. ESI then filed a declaratory judgment action in St. Louis County against SW, while a SW affiliate, Meritain Health, Inc. ("Meritain"), filed a new action against ESI in federal court in Pennsylvania. Mertain did not name SW in its new federal action, but sought expedited discovery and immediate injunctive relief on behalf of SW, predicated on the SW contract with ESI. Meritain's requests for immediate injunctive relief and expedited discovery were denied by the federal court in Pennsylvania, and concerns were raised about whether the action could proceed. Of particular concern was SW's absence in a lawsuit seeking to enforce SW's contract rights. The court set a briefing schedule and ESI moved to dismiss.

Rather than confront the legal issues raised in ESI's motion, Meritain amended its complaint, attempting to bring SW back into the lawsuit. Because the addition of SW would destroy diversity jurisdiction, Meritain purported to inject a federal question by converting contract claims to alleged Lanham Act violations. Before the amended complaint could be tested, the district court transferred this case to the Eastern District of Missouri—where ESI's state court declaratory judgment action on the contract at issue is still pending; stating "[t]he central issue in this case is whether ESI was prohibited under a Missouri contract governed by Missouri law from soliciting the plaintiffs' clients."[1]

With each amendment, the complaint has grown, but not in substance. Indeed, despite its travels and amendments, the central issue—***and defect***—remains. Plaintiffs seek to prohibit ESI from competing for SW's PBM business. They claim a contract prohibits this competition; yet, to this day, they cannot identify contract provisions that actually support their claim. The simple fact is that there is no provision in the contract at issue that prohibits ESI from competing for that business. To dress up their contract claim, Plaintiffs allege Lanham Act violations, tortious interference, alleged misappropriation of trade secrets, unfair competition, and breach of implied covenants. These claims are insufficiently pled and based on legal theories that are untenable. They should be dismissed.

## BACKGROUND AND STATEMENT OF FACTS

ESI is a leading pharmacy benefit manager ("PBM") headquartered in St. Louis, Missouri. ESI supplies a full range of prescription drug benefit services to its clients, which include employers, HMO's, health insurers, third-party administrators, union-sponsored benefit plans, workers' compensation plans, and government health plans. Prescription drugs are

[1] *See* Memorandum on Order Transferring Case (Doc. No. 31), at p. 7.

dispensed to members of the health plans that ESI serves primarily through retail pharmacies. ESI establishes and maintains retail pharmacy networks by entering into agreements with retail pharmacies. Pursuant to these agreements, the provider pharmacy dispenses prescription drugs to eligible plan participants and members and is then reimbursed by ESI at an agreed upon rate.

**SW and its Agreement with ESI**

SW is also a PBM, but subcontracts with other PBMs for some of its PBM services.[2] On August 8, 2005, ESI entered into a Prescription Drug Program Agreement ("PDPA") with SW, by which "ESI and SW…agreed to develop an arrangement whereby SW [could] 'private label' [ESI's] PBM Services for the financial terms and conditions for such services to SW Clients. . . ."[3] Two provisions of the PDPA are particularly relevant in this case—Sections 5.2 and 3.4.

Section 5.2 of the PDPA defines what ESI and SW respectively considered "Proprietary Information."[4] ESI's "Proprietary Information" is broadly defined as:

> [R]eporting and system applications, (web-based and other media), and system formats, databanks, clinical and formulary management operations and programs and manuals, information concerning Rebates, prescription drug evaluation criteria, drug choice management, drug pricing information, and Participating Pharmacy agreements.[5]

SW's "Proprietary Information" is defined as "SW information files, business operations and strategies."[6] Both parties agreed that Proprietary Information would not be used or disclosed to any third party "except as specifically contemplated by" the PDPA, or upon prior written

---

[2] Ex.1, SW Compl. at ¶ 4.

[3] Ex.2, 2005 PDPA, Recital D, attached as Ex. A to SW Compl., Ex.1 (pricing and exhibits have been omitted for this filing).

[4] *Id*. at Section 5.2; *see also* Meritain Compl. at ¶ 29 (including a partial citation of Section 5.2); Am. Compl. at ¶ 48 (same).

[5] *Id*. at Section 5.2(a).

[6] *Id*. at Section 5.2(b).

consent.[7]

Section 3.4 defines how the parties "specifically contemplated" that ESI could use drug and related data acquired through ESI's performance under the PDPA. Section 3.4 explains that ESI can use "**and/or transfer to third-parties**" any "drug and related medical data collected by ESI or provided to ESI by SW and Clients for research, provider profiling and other databases for benchmarking, drug trend, **cost analysis, cost comparisons or other business purposes of ESI**."[8] The only condition that SW placed on ESI's use of this information was that any individually identifiable protected health information ("PHI") be "de-identified in accordance with HIPAA" prior to its use or disclosure to third-parties.[9] The parties also agreed to an explicit limitation of liability (Section 7.2(c)), and agreed that the PDPA would be governed by Missouri law (Section 8.5).

The PDPA remains in place and continues to govern the relationship between ESI and SW.

**SW sues ESI in Missouri under the PDPA**

On January 9, 2012, SW filed a lawsuit against ESI in St. Louis, Missouri.[10] The SW lawsuit alleged that ESI was improperly using Proprietary Information that ESI acquired under the PDPA to solicit SW clients, after SW began announcing that it would be terminating the ESI relationship with those clients.[11] In particular, SW claimed that ESI had contacted and, in some cases, submitted pricing proposals and cost analyses to SW clients that were disparaging to SW

---

[7] *Id*.

[8] *Id*. at Section 3.4(c) (emphasis added).

[9] *Id*. (in Section 3.4(b) ESI expressly disclaimed "any liability or responsibility to SW or a Client related to the disclosure to, and use of such claims data."). Neither SW nor Meritain allege that ESI is improperly disclosing PHI in violation of this limitation.

[10] Ex. 1, SW Compl.

[11] *Id*.

because they showed that clients could save money if they contracted directly with ESI when their contracts with SW expired.[12] According to SW, ESI's actions violated Section 5.2 of the PDPA.[13] The SW lawsuit included claims for breach of contract, tortious interference and unfair competition, and it sought declaratory relief concerning the rights and obligations of SW and ESI under Section 5.2 of the PDPA.[14]

SW set a hearing for a temporary restraining order ("TRO"), which the parties agreed would take place on Friday, January 13, 2012. In setting this hearing, SW's counsel agreed to forward the papers for its TRO application by Wednesday, January 11, 2012 to allow ESI's counsel time to review them in advance of the Friday hearing. Instead, on January 11, 2012, SW voluntarily dismissed its claims, with no explanation. The next day, ESI filed a declaratory judgment action against SW in St. Louis County Circuit Court, where SW's original action had been filed.[15]

**SW's claims are re-filed in the Eastern District of Pennsylvania**
**<u>under the name of its affiliate, Meritain Health.</u>**

Unbeknownst to ESI at the time, on the same day SW dismissed its Missouri action, claims were re-filed in the Eastern District of Pennsylvania under the name of Meritain, a New York third party administrator ("TPA") with business ties to SW.[16] SW was not named as a party to that suit.

---

[12] *Id*. at ¶¶ 11-14.

[13] *Id*. at ¶ 12.

[14] *Id*. at ¶¶ 16 – 38.

[15] That action seeks a declaration that ESI is not breaching the PDPA, including Section 5.2, by offering direct services to the customers formerly served by SW. A copy of the pending declaratory judgment action is attached as Exhibit 3.

[16] Am. Compl. ¶ 6 ("Meritain is a third party administrator ("TPA") which designs and administers health benefit plans for its clients.); Ex. 1, SW Compl. at ¶ 5 ("TPAs such as Meritain design and administer self-funded employee benefit plans on behalf of companies across the country."); ¶ 4 ("SW is a prescription benefits manager ("PBM") for companies across the country.").

A TPA, like Meritain, is essentially a distributor of broad health services including medical, dental, vision, pharmacy, and various insured products.[17]  Although Meritain is not a PBM, and does not directly provide any PBM services, pharmacy/PBM services are one of the many health products Meritain distributes through its PBM suppliers.  Meritain is not mentioned in the PDPA, but claims an affiliation to SW as one of Meritain's PBM suppliers and through common ownership by Prodigy Health Group, Inc., a Delaware corporation.[18]  The following chart illustrates the relationships at issue:



Notably, claims in the SW action and those that were re-filed under the name of Meritain include virtually identical allegations, seek essentially the same relief, and in many instances appear to have been crudely cut and pasted from one complaint to the other.[19]  Most importantly, however, both actions were based on the same contractual relationship between SW and ESI as established by the PDPA, both required a declaration of rights and obligations under the PDPA,

---

[17] Meritain describes the products and services it distributes on its website.  *See, e.g.*, http://www.meritain.com/Home/BenefitSolutions/TraditionalHealthPlans

[18] Ex.1, SW Compl. at ¶¶ 1, 4 (explaining that Meritain is a New York TPA with ties to SW through shared ownership by Prodigy Health Group, Inc., a Delaware corporation); Am. Compl. ¶ 4.

[19] Jan. 12, 2012 Tr. at 18:23-24.

and both sought to enjoin an alleged breach of the PDPA. In fact, the only notable change was that Meritain stated that the clients attributed to SW in its St. Louis County Petition were actually clients of Meritain, despite statements in the SW contract suggesting otherwise.[20]

**The district court denies Meritain's request for immediate injunctive relief and ESI moves to dismiss Meritain's federal action for failure to join SW.**

On January 12, 2012, ESI was notified of the Meritain lawsuit, and participated, on short notice, in oral argument on Meritain's motion for a temporary restraining order and request for expedited discovery prior to hearing on its preliminary injunction claim. On January 13, 2012, the Honorable Mary McLaughlin of United States District Court for the Eastern District of Pennsylvania denied Meritain's request for a temporary restraining order and expedited discovery.[21] The Court raised concerns about the ability of the action to proceed, and ordered briefing. Thereafter, on January 20, 2012, ESI moved to dismiss Meritain's federal action for failure to join SW as a necessary and indispensable party whose joinder would defeat diversity jurisdiction, and because Meritain lacks standing to sue to enforce the SW contract because it is not a party to that agreement.[22] In the alternative, ESI requested that this action be transferred to the Eastern District of Missouri pursuant to 28 U.S.C. § 1404(a).[23]

Rather than address the issues raised in ESI's motion, Meritain filed an amended complaint adding SW as a party.[24] Because the addition of SW would destroy diversity

[20] These similarities are addressed in detail in ESI's initial motion to dismiss, (Doc No. 14) at pp. 8-12.

[21] Jan. 13, 2012 Order, (Doc. No. 8); Jan. 12, 2012 Tr. at 30:1-4; 8-10; 31:25-32:3.

[22] ESI's initial Motion to Dismiss (Doc. No. 14).

[23] Defendant's Mem. in Support of Motion to Dismiss (Doc. No. 14) at pp. 26-31.

[24] Am. Compl.

jurisdiction, the amended complaint purported to add "newly discovered" claims for false advertising under the Lanham Act.[25]

Before ESI could file its renewed motion to dismiss the Amended Complaint, on February 15, 2012, the Pennsylvania District Court granted ESI's alternative motion to transfer this case to the Eastern District of Missouri pursuant to 28 U.S.C. 1404(a).[26]

## ARGUMENT

"A motion to dismiss must be granted if the Complaint does not contain 'enough facts to state a claim to relief that is plausible on its face.'" *Kaminsky v. Missouri*, No. 4:07-CV-1213-JCH, 2007 WL 2492410 at * 2 (E.D. Mo., Aug. 29, 2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007)); *see also Moon v. United States et al.*, No. 1:09-CV-6-RWS, 2009 WL 260375 at *1 (E.D. Mo. Feb. 3, 2009) (same).

*Twombly* abrogated the former "no set of facts" standard for a motion to dismiss. *See Twombly*, 127 S. Ct. at 1969; *Kaminsky*, 2007 WL 2492410 at * 2. Under *Twombly*, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level."

[25] *Id*. ¶¶ 66-73. The heart of Plaintiffs' new-found Lanham Act claim appears to be an alleged "form letter," which was attached as Exhibit 1 to Meritain's **original complaint**. Plfs' Am. Compl. at ¶¶ 33-38. The same communication was also attached to the original SW complaint filed in Missouri (Ex. B), and is part of ESI's pending declaratory judgment action in Missouri State Court. *See* Ex. 3, Petition for Declaratory Judgment at ¶ 16 (quoting ESI's communications to clients mutually served by ESI and SW). Plaintiffs' "newly discovered" Lanham Act allegations concerning that letter, and the two alleged oral statements that supposedly followed it, are evidence of Plaintiffs' attempt to manufacture a jurisdictional panacea and nothing more. They certainly do not support claims under the Lanham Act or cure the threshold problems with this action.

[26] Feb. 13, 2012, Memorandum and Order, (Doc. No. 31).

*Twombly*, 127 S. Ct. at 1964-65 (quoting Fed. R. Civ. P. 8(a)(2)); *Kaminsky*, 2007 WL 2492410 at * 2.[27]

While Plaintiffs make a great deal of noise about all sorts of allegedly "improper" means that ESI is using to compete, their own pleadings—and the documents and letters they incorporate—belie their conclusory allegations. Unsubstantiated rhetoric that contradicts the documents it cites does not make a plausible claim sufficient to survive a motion to dismiss. *Id*.

For example, Plaintiffs allege that ESI is improperly "soliciting" PBM clients with pricing proposals that are based on information ESI gained through its relationship with SW under the PDPA. While ESI denies this, even if the proposals were based on data that ESI obtained through the PDPA, the use of that data to provide cost analyses or cost comparisons to third parties **could not** support a claim. The SW contract at issue—incorporated into Plaintiffs' complaint—makes this point clear. Under the PDPA, SW explicitly granted ESI "permission" to use such information "both during and after the term" of the PDPA "and/or to transfer [it] to third parties" for "cost analysis, cost comparisons or other business purposes of ESI."[28] Consistent with this "permission," the PDPA does not include any non-solicitation provisions and the only "drug pricing information" that the PDPA defines as "Proprietary Information" is ESI's pricing information.[29]

Plaintiffs also allege that ESI is sending form letters that make false and misleading statements about their products and services in violation of the Lanham Act. Yet the only letters identified in any pleadings are innocuous communications; standard in the business world.

---

[27] The decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009), reinforced the application of the *Twombly* standard to motions to dismiss. *See also McDonald v. Blake*, 2009 WL 1118823, at *1 (E.D. Mo. Apr. 24, 2009) (applying the *Twombly* "plausibility" standard).

[28] Ex. 2, 2005 PDPA, Section 3.4(c); Am. Comp., Ex. 1.

[29] *Id*. at Section 5.2.

They do not mention Meritain at all, and only mention SW in passing, and certainly not in a false or misleading way that would offend the limited confines of the Lanham Act.   ESI is merely letting potential clients know that:

> [I]f, at the conclusion of whatever contractual obligations you may have with Scrip World, you are interested in considering alternative Pharmacy Benefit Management (PBM) vendors, Express Scripts would welcome the opportunity to serve as your PBM through a direct arrangement with Express Scripts."[30]

 If these communications are improper, then virtually every for-profit business in America is violating the Lanham Act and engaging in "unfair" competition.  That is not the law.

Plaintiffs' claims are meritless and should be dismissed.

## I.      Plaintiffs' Lanham Act Claims Are Improper and Should be Dismissed.

Count I of Plaintiffs' Amended Complaint purports to add claims under the Lanham Act—the sole basis for jurisdiction in this case.  The addition of supposedly new allegations under a "Lanham Act" heading, does not change the fundamental character of this case—it rises and falls based on the relationship between ESI and SW.  And contrary to Plaintiffs' representations, the addition of their alleged Lanham Act count does not cure the fundamental problems that plague this action.  Plaintiffs' Lanham Act claim fails for several independent reasons.

First, Meritain's Lanham Act claim fails because Meritain lacks standing.  Meritain is a TPA distributor of PBM services, not a competing PBM.  As such, Meritain lacks standing under the Lanham Act to assert claims that relate to the PBM business of its affiliate PBM, SW.

---

[30] *See, e.g.*, Ex.1, SW Compl. at Exhibit B; Meritain Compl. (Doc. No. 1), Ex.1.   Because Plaintiffs' pleadings rely on these documents, they may be considered on a motion to dismiss.  *See Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) ("In addressing a motion to dismiss, the court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record.") (citation omitted); *Hargis v. U.S. Bancorp*, No. 4:10-CV-00027JCH, 2010 WL 4923340, 2 (E.D. Mo., Nov. 29, 2010) (court may consider contents of documents that plaintiff claimed gave rise to defendant's liability).

Second—separate and apart from the standing issues—Plaintiffs' Lanham Act claim should be dismissed because Plaintiffs' conclusory and vague allegations simply cannot support a claim, and the "letter" and two "oral statements" they reference are not improper commercial advertising or promotion within the Lanham Act.

Without the "Lanham Act" and SW, Meritain is back to square one—with no basis to proceed in this court.[31]

***A. Meritain lacks standing under the Lanham Act.***

The Lanham Act requires a false statement, made in "commercial advertising or promotion." *Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864, 871 (8th Cir. 2005). Standing under the Lanham Act is limited. *Id*. In *Aviation Charter*, the Eighth Circuit applied a categorical test and held that Lanham Act standing could only lie with direct commercial competitors of the alleged wrongdoer. *Id*. "For a statement to constitute commercial advertising or promotion" it must be made "by a defendant who is in commercial competition with the plaintiff." *Id*.

Roughly six-months after deciding *Aviation Charter*, the Eighth Circuit revisited Lanham Act standing and acknowledged what "may be a circuit conflict" on whether the Lanham Act's prudential standing considerations should be "categorical," as applied in *Aviation Charter*, or the

---

[31] ESI previously moved to dismiss for failure to join SW, a necessary and indispensable party who, like ESI, is a Delaware corporation whose presence would destroy diversity jurisdiction over this case. Without Lanham Act claims by SW, there is no basis for federal jurisdiction. ESI incorporates by reference its prior motion to dismiss (Doc. No. 14), as if set forth herein. To the extent Plaintiffs' Lanham Act claims are dismissed, but other claims remain, then the jurisdictional defects addressed in ESI's original motion also remain and must be considered. *See, e.g., Devary v. Countrywide Home Loans, Inc.*, 701 F. Supp.2d 1096, 1100 (D. Minn. 2010) ("As a general rule, a defendant need not file a new Rule 12 motion merely because plaintiff amended his pleading while the defendant's motion was pending. 'If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the new pleading…To hold otherwise would be to exalt form over substance.'") (quoting 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1476 (2d ed.)). Moreover, because SW's claims are based on the same facts and inextricably tied to the prior pending state court action, they may only be brought, if at all, as compulsory counterclaims in that case. *Bankcard Sys., Inc. v. Miller/Overfelt, Inc.*, 219 F.3d 770, 773 (8th Cir. 2000).

less categorical "multi-factor" test based on the Supreme Court's test for antitrust standing. *American Association of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1103-4 (8th Cir. 2006) (affirming dismissal by this Court).[32] The decision is instructive.

Plaintiff was a trade-organization organized to *promote* orthodontists; it sued Yellow Book for allegedly violating the Lanham Act by listing general dentists under categories for orthodontists. *Id*. This Court dismissed for lack of standing, and the Eighth Circuit affirmed. *Id*. In affirming dismissal, the Eighth Circuit explained the distinction between standing tests did not matter, because the plaintiff's claims failed under either test, including the less-rigid multi-factor test. *Id.* at 1104 (citing *Conte Bros. Auto, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 233-35 (3d Cir. 1998)).

The same is true here. Meritain is not a direct competitor, or PBM provider, but rather a TPA distributor. Meritain would clearly fail any categorical standing test. Evaluating Meritain's standing under the less-categorical multi-factor test produces the same result and shows why Meritain cannot meet the "prudential considerations" that define and limit the "role of the courts" in exercising their powers "to enforce the Lanham Act." *Id*. (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

The Third Circuit's decision in *Conte Brothers Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221 (3d Cir. 1998), is a leading case. Retail sellers of motor oil and engine lubricants sued manufacturers of another engine lubricant for false advertising. 165 F.3d at 223-

[32] Under the multi-factor standing test "a plaintiff must show that he has a reasonable interest" that is direct, and does not conflict with, or is duplicative of, other interests. *Conte Brothers Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 223-24 (3d Cir. 1998); *see also NDN Drywall, Inc. v. Custom Drywall, Inc.*, No. Civ- 04-CV-4706DSDSRN, 2005 WL 1324056 at *10 (D. Minn. May 4, 2005) (applying *Conte Bros*. multi-factor test and dismissing claims). The court must weigh: (1) the nature of the plaintiff's alleged injury; (2) the directness or indirectness of the asserted injury; (3) the proximity or remoteness of the party to the alleged injurious conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages or complexity in apportioning damages. *Id.* If allegations fail to establish a direct interest, the false advertising claim must be dismissed. *Id*.; *Parker*, 605 F. Supp.2d at 664; *The Knit With v. Knitting Fever, Inc.*, No. Civ. A. 08-4221, 2008 WL 5381349, at *16 (E.D. Pa. Dec. 18, 2008).

24. Since the retailers were not direct competitors of the defendant manufacturers, the retailers claimed they possessed standing by suffering lost revenue due to lower sales of competing motor oil and engine lubricants. *Id.* at 224. The Third Circuit disagreed. While the retailers "alleged a commercial interest" they did not allege the type of direct competitive harm necessary to be actionable under the Act. *Id.* at 234.

The Third Circuit further explained that the retailers' "remoteness from the allegedly harmful conduct" and speculative damages weighed against their standing. *Id.* at 235. Specifically, because competing manufacturers of motor oil and engine lubricants were more directly injured than the retailers, the court held that the retailers should not be given the right to sue for the defendants' allegedly false advertising. *Id.* In fact, allowing such remote claims could subject the defendants to "multiple liability for the same conduct." *Id.* As the Third Circuit explained:

> [R]ecognizing the right of every potentially injured party in the distribution chain to bring a private damages action would subject defendant firms to multiple liability for the same conduct and would result in administratively complex damages proceedings. Additionally, such a holding could result in an enormous number of relatively insignificant cases being litigated in the federal courts….
>
> Our conclusion would not be altered if we were to assume some percentage of Slick 50s sales were made directly to end users and that the parties, therefore, were "competitors" in some limited sense. Under the reasoning we adopt today, standing under the Lanham Act does not turn on the label placed on the relationship between the parties. Given the existence of more directly injured parties the tenuousness of Appellants' damages claims, and the possibility of multiple recoveries, we would not be inclined to revisit our conclusion that the Appellants lack standing even if we assume a nominally competitive relationship.

*Id.* at 235. The court, therefore, found that the retailers' "alleged harm [was] not the type that Congress sought to redress by enacting the Lanham Act" and that their action should be dismissed. *Id.* at 234-35.

The concerns raised in *Conte Brothers* and *American Association* are even more apparent here. Meritain and SW are affiliated entities making the "same" claims based on the "same" alleged conduct and seek duplicative damages.[33] And while the alleged damages of each are speculative, the connection between any of the alleged communications and Meritain is tangential, at best. In fact, despite Plaintiffs' assertions to the contrary, the alleged "form" letter that appears to be at the heart of their Lanham Act claim does not even mention Meritain; only SW, the competing PBM.[34] In the chain of distribution, it is ESI and SW—both PBMs—that are *providers* of PBM services. Meritain, as a TPA, is merely a distributor or "reseller" of those services. If anyone has the more "direct" connection to the communications at issue it is SW, the PBM with the relationship to ESI through the PDPA. Allowing both the distributor (Meritain) and PBM provider (SW) to sue for the same claims is exactly the scenario the direct/reasonable interest test precludes. Accordingly, Meritain's Lanham Act claim should be dismissed for lack of standing.

---

[33] Am. Compl. at ¶¶ 66-73. The fact that Meritain and SW are closely affiliated sister entities, owned by the same parent, makes the analysis even clearer. *IDT Telecom, Inc. v. CVT Prepaid Solutions*, No. 07-1076, 2009 WL 5205968 (D. N.J. Dec. 28, 2009), is instructive. A supplier of phone cards and the supplier's exclusive distributor brought a Lanham Act claim against another phone card supplier. *Id.* at *1. Like Meritain, the exclusive distributor claimed that it worked "in conjunction with [its supplier] to provide high quality services and products" to customers and that it possessed standing because it suffered an injury from the supplier's loss of market share to defendant. *Id.* at *5. The district court found that these facts were "fatal to [the distributor's] standing…" *Id.* at *6. The court explained that such indirect loss could not establish the distributor's standing and that "the close relationship between [the distributor and the supplier] would lead to multiple liability" for the defendant. *Id.*; *see also Emerging Material Technologies, Inc. v. Rubicon Technology, Inc.*, No. 09-C-3903, 2009 WL 5064349, *4 (N.D. Ill. Dec. 14, 2009) (dismissing claims and explaining that Lanham Act standing requires the "the plaintiff and defendant to be direct competitors, in other words, 'that it competes at the same level of business as defendant.'"); *Platinumtel Comms, LLC v. Zefcom, LLC,* No. 08-C-1062, 2008 WL 5423606, at *6 (N.D. Ill. Dec. 30, 2008) (same; collecting cases). The same is true here.

[34] *Compare* Am Compl. at ¶¶ 37-38 (mischaracterizing ESI's template letters) with Meritain Compl. Ex. 1 (attaching template letters at issue); *see also* Ex.1, SW Compl. at Ex. B (attaching examples of actual communications).

### *B. Plaintiffs' Lanham Act claim must be dismissed because Plaintiffs have failed to state a claim.*

Separate and apart from Meritain's standing problems, Plaintiffs have failed to state a claim under the Lanham Act. Count I alleges that ESI has violated the Lanham Act through "written letters and subsequent oral statements" that are false and misleading because they "omit material facts concerning the products and services Plaintiffs' [sic] offer."[35] According to Plaintiffs, these statements "leave the recipient" with "a false impression about Plaintiffs' products and services and decisions that Plaintiffs have made or have not made with respect to what products and services they will offer in the future."[36]

Count I does not actually identify any of the "written letters and subsequent oral statements" at issue with any specificity; and digging through the sixty-five paragraphs of rambling allegations that precede Count I offers little guidance. At best, these claims appear to be based on a "'form' template" letter allegedly sent to "Meritain" customers, a voicemail an undisclosed "customer" received from an undisclosed ESI salesperson, and information Plaintiffs "recently learned" about an undisclosed statement made to an undisclosed "Meritain customer."[37] Conspicuously absent are details and context concerning any of the actual

---

[35] Am. Compl. at ¶¶ 67-68 (emphasis added). Plaintiffs' theory, in this respect, seems to be one of misrepresentation by omission—that the Lanham Act somehow imposes affirmative obligations on businesses to market the products and services of their competitors. That has never been the law. Indeed, this Court recently rejected an improper attempt to work around the Lanham Act based on an equally "novel misrepresentation-by-implication theory." *See Dutch Jackson IATG, LLC v. The Basketball Marketing Co*., No. 4:11-CV-227(CEJ), 2012 WL 124579, *3 (E.D. Mo. Jan. 17, 2012) (dismissing Lanham Act claims and describing "plaintiffs' novel misrepresentation-by-implication theory" as "an impermissible workaround" that would "impose an affirmative duty on defendants" not supported under the Lanham Act.). Plaintiffs' theory in this case suffers from the same defect. Puffery is not actionable and the heart of Plaintiffs' claim is that it is somehow made actionable by an "affirmative" duty to make affirmative representations about "Plaintiffs' products and services." Am. Compl. at ¶¶ 67-68. That theory has no support in the law.

[36] *Id*. (emphasis added). Statements of opinion about future events are not actionable under the Lanham Act. *See infra*. at p. 20.

[37] Am. Compl. at ¶¶ 33-38.

communications allegedly at issue. Instead, the Amended Complaint relies on Plaintiffs' conclusory characterizations:

(1) that a form letter "falsely suggest that the other vendor used by Plaintiffs is of poorer quality than the client's existing service, and does not offer all of the products and services that ESI claims to provide";

(2) that the undisclosed "voicemail" falsely suggested that Plaintiffs are changing PBM vendors when "no change or switch was being made at all"; and

(3) that the undisclosed "Meritain customer" recently learned that "twenty percent of Meritain's business was moved from ESI" to an Aetna vendor and that "as of January 1, 2013 Meritain and SW would no longer do business with ESI."[38]

According to Plaintiffs, these alleged statements are actionable because they are literally "false and misleading." In fact, the allegations do not support any viable Lanham Act claims.

First, Plaintiffs have failed to plead their Lanham Act claims with particularity. This alone is a basis to dismiss. Second, even if with the lack of specificity in their complaint, it is clear that Plaintiffs' Lanham Act theories are untenable because they are not based on actionable false and misleading statements in commercial advertising.

***1. Plaintiffs have failed to plead their Lanham Act claims with sufficient specificity.***

As discussed above, Plaintiffs have failed to identify any statements with particularity, let alone specify "which" actual customers were allegedly confused by those statements, or tie any particular customer response to any particular statement.[39] Instead, Plaintiffs offer conclusory

---

[38] *Id*. at ¶¶ 35-37.

[39] Am. Compl. at ¶¶ 66-73. Paragraph 42 of the Amended Complaint also highlights the speculative, vague, and conclusory nature of Plaintiffs' allegations. Am. Compl. at ¶42. There, Plaintiffs conclude—without support—that customers have been confused by communications from ESI. They do not attempt to tie *any* alleged customer confusion to *any* specific customer or actual statement from ESI, or identify a single customer who has been influenced by any communication in any way that would impact Plaintiffs. Statements like "See below. What is up with that," "So What is the deal with Express Scripts/Scrip World…What's up with that?," and the other vague and unattributed statements in Paragraph 42 are exactly the sort of vague and conclusory allegations the post-*Twombly* courts have found insufficient to survive dismissal.

allegations dependent on speculation and conjecture. *Twombly*, 127 S. Ct. at 1964-65. Under these circumstances, federal courts routinely dismiss Lanham Act claims:

- *NDN Drywall, Inc.*, 2005 WL 1324056 at *10 (dismissing Lanham Act claims because plaintiff "does not specify which contractors were confused as a direct result of [the alleged] misrepresentations" making any injury "speculative");

- *Ameritox, Ltd. v. Millennium Labs*., No. 8:11-cv-775-T-24-TBM, 2012 WL 33155, at *3-4 (M.D. Fla. Jan. 6, 2012) (dismissing Lanham Act claims under *Twombly* and *Iqbal* because plaintiffs' allegations of deception were "naked assertions" devoid of factual enhancement and never alleged "to whom the statements were made, the breadth of their dissemination, how the statements were false or misleading, and how the advertisements deceived or tended to deceive a substantial portion of customers.");

- *Emerging Material Technologies, Inc. v. Rubicon Technology, Inc*., No. 09-C-3903, 2009 WL 5064349, *4 (N.D. Ill. Dec. 14, 2009) (finding dismissal of Lanham Act claims warranted where plaintiffs failed to make sufficient allegations that a "consumer has actually relied on [the] allegedly false statements in a way that injured plaintiffs.");

- *Brosnan v. Tradeline Solutions, Inc.*, No.C-08-0694-JCS, 2009 WL 1604572, at *5 (N.D. Cal. June 5, 2009) (dismissing Lanham Act claims because plaintiff failed to allege particular facts concerning the alleged statements, including who made the statements, when the statements were made and to whom);

- *Williamson v. Rexam Beverage Can Co*., 497 F. Supp.2d 900, 909-10 (S.D. Ohio June 18, 2007) (finding that, regardless of whether it was evaluated under Rule 8(a) or 9(b), plaintiffs failed to state a Lanham Act claim because they did not "indicate even approximately when or how Rexam allegedly made misrepresentations to the marketplace or even under which prong of 15 U.S.C. § 1125(a)(1) they are proceeding);

- *Insignia Sys., Inc. v. News Corp., Ltd*., No. Civ-04-4213JRTFLN, 2005 WL 2063890, at *5 (D. Minn. Aug. 25, 2005) (dismissing Lanham Act claim where complaint failed to indicate "what allegedly false statements were made to which party in what context.");

- *Professional Sound Servs., Inc. v. Guzzi*, No. 02-CIV-8428, 2003 WL 22097500 (S.D.N.Y. Sept. 10, 2003) (dismissing Lanham Act claims based on "one-to-one conversations about matters" that were more akin to non-actionable statements of opinion);

- *Chovanes v. Thoroughbred Racing Assoc*., No. CIV-A-99-185, 2001 WL 43780, at *8 (E.D. Pa. Jan. 18, 2001) (granting motion for judgment on the pleadings where plaintiff based Lanham Act claims on a letter and "oral statements" allegedly made "to unspecified third parties");

- *Max Daetwyler Corp. v. Input Graphics, Inc*., 608 F. Supp. 1549, 1556 (E.D. Pa. 1985) (explaining that, although all of the Rule 9(b) requirements may not apply, "the policies which underlie Rule 9's requirement that the nature of an alleged misrepresentation be pleaded with specificity are equally applicable to the type of misrepresentation claims presented in plaintiffs' Lanham Act claim. In litigation in which one party is charged with making false statements, it is important that the party charged be provided sufficiently detailed allegations regarding the nature of the alleged falsehoods to allow him to make a proper defense.").

These cases are directly on point. While Plaintiffs may include a half-hearted "formulaic recitation of [some of] the elements" of a Lanham Act claim, that "will not do." *Twombly*, 127 S. Ct. at 1964-65. Plaintiffs' failure to plead with any specificity and identify the complete and actual statements at issue—let alone who made them, when they were made, in what context, and to whom—is fatal.

***2. The alleged "letter" and oral statements by sales representatives are not actionable "commercial advertisement or promotion" under the Lanham Act.***

The Lanham Act requires "false and misleading" statements in "commercial advertising or promotion." 15 U.S.C. §1125(a). Plaintiffs do not provide detail on the specific statements at issue—an alleged letter to potential PBM customers, an alleged "voicemail" left by an unidentified sales director to an unidentified customer, and an unknown statement an undisclosed customer "recently" learned from a different undisclosed sales director.[40] That failure alone is a basis to dismiss.[41] Even with the lack of specificity in Plaintiffs' Amended Complaint, however, it is clear that their Lanham Act theories are untenable.

---

[40] Am. Compl. at ¶¶ 35-37.

[41] *Supra*. at pp. 16-18.

For example, even if the alleged letter and oral statements fit the Lanham Act's definition of "commercial advertising"—which ESI denies—they would not be actionable because they are clearly not improper "false or misleading" statements about products or services.[42] Take the oral statements, for example. Plaintiffs allege that ESI sales representatives (1) falsely suggested that Plaintiffs were switching PBM vendors; (2) falsely represented that ESI learned that twenty percent of Meritain's business was being moved from ESI to the Aetna vendor; and (3) falsely

---

[42] The alleged "oral" statements by two sales representatives are clearly not actionable "advertising," nor does it appear that the alleged letters by sales representatives would qualify as the type of widespread commercial advertising the Lanham Act was intended to regulate. The Seventh Circuit's analysis in *First Health Group, Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001), is instructive. A health care provider brought suit against a competitor alleging Lanham Act violations based on statements the competitor made in soliciting, and negotiating for, business. Plaintiff claimed that such statements were "false" and violated the Lanham Act's prohibition on false or misleading statements in commercial advertising or promotion. *Id*. The Seventh Circuit rejected the theory outright:

> One preliminary question is how the negotiations between UP & UP and particular hospitals—negotiations handled in private, among business executives and lawyers—could be called "commercial advertising or promotion," an essential ingredient of any claim under § 43(a)(1)(B).
>
> **Advertising is a form of promotion to anonymous recipients, as distinguished from face-to-face communication.** In normal usage, and advertisement read by millions (or even thousands in a trade magazine) is advertising, while a person-to-person pitch by an account executive is not…. "Advertising is a subset of persuasion and refers to dissemination of prefabricated promotional material." … Now this is a matter of ordinary usage; perhaps "commercial advertising or promotion" in § 43(a)(1)(B) is a term of art. Yet First Health has not offered any material from the time of the Lanham Act's adoption (either legislative history or other examples of usage in the legal community) implying that the statutory phrase "commercial advertising or promotion" means anything other than what a user of normal English would assume….
>
> We held in *Zurich* that statements by a firm's sales force could not be called "advertising"; likewise, **it is hard to see how statements of UP & UP's executives and lawyers, made over a conference table in an effort to negotiate a contract…could be called "commercial advertising or promotion**."

*First Health Group, Corp.*, 269 F.3d at 803-4 (citations omitted; emphasis added). The same is true here. The alleged client "letter" and isolated oral statements are not the type of widely disseminated "commercial advertising" the Lanham Act was intended to regulate. *Id.*; *see also ISI Int'l, Inc. v. Borden Lahner Gervais LLP*, 316 F.3d 731, 733 (7th Cir. 2003) ("[T]he Lanham Act claim that justified the presence of this case in federal court turns out to be untenable…letters sent to customers do not come within the scope of [the Lanham Act]."); *Foboha Gmbh v. Gram Tech., Inc*., No. 08-C-0969, 2008 WL 4619795 at *3 (N.D. Ill. Oct. 15, 2008) (dismissing Lanham Act claims because "allegedly false statements made in the course of negotiations" and "direct communications, whether in person or by letter are not commercial advertising or promotion…"); *Conditional Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp.2d 704, 710 (N.D. Ill. 2006) (same); *Insignia Sys*., 2005 WL 2063890 at *5 (dismissing Lanham Act claims based on allegedly objectionable statements defendant made "in connection with sales of its own product" as opposed to a "widespread advertising campaign to discredit" plaintiff's product); *Med. Graphics Corp. v. SensorMedics, Corp*., 872 F. Supp. 643, 650 (D. Minn. 1994) (oral statements and letters by sales representative to potential customers, as opposed to a traditional advertising campaign, are likely not commercial advertising under the Lanham Act).

represented that "as of January 1, 2013 Meritain and SW would no longer do business with ESI."[43]

Statements of opinion about possible future events are not actionable. *See, e.g., Randa Corp. v. Mulberry Thai Silk, Inc*., No. 00-CIV-4061(LAP), 2000 WL 1741680, at *2-3 (S.D.N.Y. Nov. 27, 2000) (dismissing Lanham Act claims based on "an opinion about a possible future event" as beyond the scope of the Lanham Act); *Lutheran Assoc. of Missionaries and Pilots, Inc. v. Lutheran Assoc. of Missionaries and Pilots, Inc*., No. Civ-03-6173-PAM, 2005 WL 629605, at *3 (D. Minn. 2005) (rejecting Lanham Act claims based on statements of future acts because such "statements are not assertions of objective fact…."); *Medison America, Inc. v. Preferred Med. Sys., LLC*, 548 F.Supp.2d 567, 579 (W.D. Tenn. 2007) ("a mere prediction or opinion about the future…is not actionable as a false or misleading statement under the Lanham Act.").

In addition, Plaintiffs' Lanham Act attack on statements that ESI sales representatives allegedly made—that Plaintiffs are "switching PBM vendors" and that ESI had learned that "twenty-percent of Meritain's business was being moved"—are also flawed because they are based on a theory that is contradicted by Plaintiffs' own allegations. Indeed, in a prior iteration of its complaint—and a sworn declaration under penalty of perjury—***Meritain*** actually alleged that SW and Meritain were "**switching PBM providers**" and that ESI had learned that "**it was losing approximately twenty percent of its Meritain/SW business**…"[44] These are the very statements Plaintiffs now contend are actionable if made by ESI. It is disingenuous for Plaintiffs

[43] Am. Compl. at ¶¶ 35-36.

[44] Meritain Compl. (Doc. No. 1) at ¶¶ 22-23 (emphasis added); *see also* Plfs' Mem. in Support of TRO (Doc No. 3) at p. 1 (stating that "Meritain recently announced that it was **switching PBM providers** to a firm other than ESI for some of its customer base.") (emphasis added); p.5 (alleging that "**After learning that it was losing approximately twenty percent of its Meritain/SW business**, ESI began a campaign to steal those clients, as well as all of the clients for which ESI is still a PBM vendor.") (emphasis added); Declaration of David Parker, Meritain's Senior Vice President (Doc. No. 3-2) at ¶ 12 ("**After learning that it was losing approximately twenty percent of its Meritain/SW business**, ESI began a campaign to take our clients.");

to make public allegations in one complaint, and then amend that complaint to accuse the defendant of Lanham Act violations for allegedly repeating Plaintiffs' prior public allegations.

The disingenuous nature of Plaintiffs' Lanham Act claim is equally apparent with respect to the alleged "form" letters.  Two ESI form letters were attached as "Exhibit 1" to Meritain's first complaint.[45]  They are conspicuously absent from the Amended Complaint, although it is the Amended Complaint that now alleges that an ESI "form letter" violates the Lanham Act because it supposedly:

> [F]alsely suggests that the other vendor used by Plaintiffs is of poorer quality than the client's existing service, and does not offer all of the products and services that ESI claims to provide.[46]

Because Plaintiffs amended their complaint to be *less* precise than the prior complaint in this respect, ESI cannot say for sure that the form letter this allegation purports to describe is indeed the one of the letters referenced in, and attached to, Plaintiffs' prior complaint.  ESI is aware of, and Plaintiffs have identified, no others.

Assuming the letters are the same, then Plaintiffs have mischaracterized them.  Contrary to Plaintiffs' amended allegations, no other vendor is mentioned, nor are there any statements that some other vendor offers "poorer quality" or lesser services.  While the letters do say that ESI is a "best in class" PBM and "industry leader,"[47] such statements are—at worst—classic "puffery."  Indeed, Meritain is guilty of the same boasts:

- "Meritain Health's **best in class** services are comprehensive, fully integrated and customized to each client's needs."[48]

---

[45] Meritain Compl. (Doc. No. 1), Ex. 1.

[46] Am. Compl. at ¶ 37.

[47] Meritain Compl. (Doc. No. 1), Ex. 1.

[48] http://www.meritain.com/Home/BenefitSolutions/SelfFundingSolutions/SelfFundingaSmartSolution (emphasis added).

- "Meritain Health **leads the industry** in consumer-driven health plans. We are also a leader in disease management, wellness and member education programs designed to drive down the cost of health benefits."[49]

- "Meritain Health continues to offer **industry leading** generic fill rates…"[50]

- "Our administrative relationships with major Pharmacy Benefits Managers (PBMs) including Express Scripts and Pharmacare, result in significant savings for our clients…." and "provide our members and clients with efficient health care savings and member satisfaction through deep discounts, **industry-leading** Generic Fill Rates."[51]

- Meritain Health's company-wide Cost Management controls are designed to be proactive by filtering and examining potential high cost situations and trends as soon as they arise. The **industry leading** in-house Cost Management Solutions, established over 20 years ago, surpassed trends by 17% in 2005.[52]

- Meritain is "a sophisticated, efficient business providing **industry-leading** performance and service standards."[53]

Contrary to what Plaintiffs would now have this Court believe, describing one's business as "industry leading" and "best in class" is classic puffery, and not actionable.

- *American Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 390-91 (8th Cir. 2004) (statement that product was "America's Favorite Pasta" was not actionable as a matter of law under the Lanham Act because it was mere puffery);

- *Cook Perkiss and Liehe, Inc. v. Northern California Collection Serv., Inc.*, 911 F.2d 242, 245-6 (9th Cir. 1990) (explaining that whether an alleged statement is puffery is a question of law, particularly appropriate to decide on a motion to dismiss; and finding claims based on collection agency's statements that it provided the same services at a lower cost were properly dismissed as puffery; "The statement that 'we're the low cost commercial collection experts' and any implication that NCC has comparable services to attorneys at lower rates are general assertions of superiority rather than factual misrepresentations. The

---

[49] *Id*. (emphasis added).

[50] https://www.meritain.com/Home/BenefitSolutions/CostManagement/Rx (emphasis added).

[51] *Id*. (emphasis added). Ironically, this advertisement actually concedes that services provided by ESI are industry leading.

[52] http://www.meritain.com/Home/BenefitSolutions/CostManagement (emphasis added).

[53] www.meritain.com/Home/BenefitSolutions/TraditionalHealthPlans/MedicalServices (emphasis added).

advertisement does not contain the kind of detailed or specific factual assertions that are necessary to state a false advertising cause of action under the Act.");

- *Language Line Servs. v. Language Servs., Inc*., No.C-10-02605-JW, 2011 WL 5024281, at *12 (N.D. Cal. Oct. 12, 2011) (dismissing Lanham Act claims based on statements that a company had "taken the lead on setting standards and best practices" because "advertising which merely states in general terms that one product superior is not actionable"; "[S]tatements that one company has 'taken the lead' in a given area is the sort of puffery which is not actionable under a theory of false advertising. The statement is clearly not quantifiable, and does not make claims that are verifiably true or false about any specific aspect of Language Line's product.");

- *Interape Polymer Corp. v. Inspired Tech., Inc*., 725 F.Supp.3d 1319, 1333-35 (M.D. Fla. July 2010) (statements that product was "**best in class**" and "**industry leading**" were non-actionable puffery and failed as a matter of law; "'**[I]ndustry leading' is classic puffery**") (emphasis added);

- *Robert Bosch LLC v. Pylon Mfg. Corp*., 632 F.Supp.2d 362, 366 (D. Del. 2009) (dismissing Lanham Act claims based on puffery because "[o]nly statements of fact capable of being proven false are actionable under the Lanham Act…").

Plaintiffs' Lanham Act claims are meritless and should be dismissed.

## II. Meritain's claim for common law unfair competition fails with its deficient Lanham Act claim.

Count II of Plaintiffs' Amended Complaint purports to assert a common law "unfair competition" claim on behalf of Meritain. Count II copies—verbatim—the deficient Lanham Act allegations from Count I.[54] Because Count I fails, so too does Count II. *E-Z Dock, Inc. v. Shoremaster, Inc.*, No. 06-6008-CV-SW-RED, 2006 WL 1153901, at *3 (W.D. Mo. April 25, 2006) (dismissing Missouri common law unfair competition claim when plaintiff failed to allege a claim under Lanham Act).[55]

[54] *Id*. at ¶¶ 74-81.

[55] *See also Swisher Mower & Machine Co., Inc. v. Haban Mfg., Inc.*, 931 F. Supp. 645, 648 (W.D. Mo. 1996) ("An unfair competition claim under Missouri common law has the same elements" as a claim under the Lanham Act.); *Acoustics Dev. Corp. v. Phillips & Brooks/Gladwin Corp.*, 92-1061-CV-W-6, 1993 WL 444628, at *1 n.2 (W.D. Mo. Nov. 1, 1993) ("Missouri common law of unfair competition follows the general principles of unfair competition expressed in the Lanham Act."); *Words & Data, Inc. v. GTE Comm. Servs., Inc.*, 765 F. Supp. 570, 579

**III. Meritain fails to state a claim for tortious interference (Count III), because it does not allege a breach of any contract or lost business expectancy.**

To succeed on a tortious interference with existing contractual relationships or business expectancy claim, a plaintiff must prove "'(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) the absence of justification; and (5) damages.'" *St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851, 865 (8th Cir. 1998) (quoting *Rice v. Hodapp*, 919 S.W.2d 250, 245 (Mo. 1996)).[56]

As this Court and the Eighth Circuit have recognized, the failure to plead a breach of contract is fatal to a tortious interference with contract claim. *iCard Stored Value Solutions, L.L.C. v. West Suburban Bank*, No. 4:07-CV-1539, 2008 WL 619236 (E.D. Mo. Mar. 3, 2008), is

(W.D. Mo. 1991) ("Missouri common law regarding unfair competition is coextensive with federal law [under the Lanham Act]"); *see also Ameritox, LTD v. Millennium Labs., Inc.*, No. 8:11-cv-775-T-24-TBM, 2012 WL 33155, at *5 (M.D. Fla. Jan. 6, 2012) ("Because Amertox bases its common law unfair competition claim on the theory of false advertising, the Court has evaluated Amertox's common law unfair competition claim through the lens of the Lanham Act, and based on the Court's conclusion above that Ameritox failed to state a plausible claim under the Lanham Act, its unfair competition claim is likewise insufficiently pled."); *Bronson v. Tradeline Solutions, Inc.*, No.C-08-0694-JCS, 2009 WL 1604572, at *6 (N.D. Cal. June 5, 2009) ("For the reasons discussed with respect to the Lanham Act claim, Plaintiff's state law claims—fraud, unfair competition and false advertising—fail to state a claim upon which relief can be granted. Each of the state law claims contains the same recitation of general factual allegations, and incorporates the previous allegations by reference…").

[56] If a case is transferred pursuant to 28 U.S.C. § 1404(a), the transferee court applies the transferor court's choice of law rules. *Eggleton v. Plasser & Theurer Export Von Bahnbaumaschinen Gesellschaft, MBH*, 495 F.3d 582, 585-86 (8th Cir. 2007). "For substantive tort issues, Pennsylvania uses a combination of the 'government interest' and 'significant relationship' approaches to conflict of laws analysis." *Kirschbaum v. WRGSB Assoc.*, 243 F.3d 145, 150 (3d Cir. 2001) (quoting *Troxel v. A.I. DuPont Inst.*, 636 A.2d 1179, 1180-81 (Pa. Super. Ct. 1994)). Under this inquiry, "a court must evaluate the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law." *Troxel*, 636 A.2d at 1181. Here, Missouri law governs Plaintiffs' tort claims because Missouri has the greatest interest in this dispute, and Plaintiffs' claims all arise from conduct centered in Missouri. As noted by Judge McLaughlin when ordering transfer, Plaintiffs' claims relate to communications stemming from ESI's Missouri headquarters and the parties' relationship under the PDPA, a Missouri contract governed by Missouri law. *See* Memorandum on Order Transferring Case (Doc. No. 31), at p. 6-7 (Feb. 13, 2012) (McLaughlin, J). Even if Plaintiffs contend that Pennsylvania law applies to this claim, the failure to allege a breach is fatal to tortious interference claims under Pennsylvania law as well. *See Clubcom v. Captive Media, Inc.*, No. 02:07-cv-1462, 2009 WL 249446, at *12 (W.D. Pa. Jan. 31, 2009) (dismissing a claim for tortious interference and stating, "For a plaintiff to prevail on an interference claim, Pennsylvania courts require a breach or nonperformance of the contract at issue."); *Bioquell, Inc. v. Feinstein*, No. 10-2205, 2010 WL 4751709, at *7 (E.D. Pa. Nov. 23, 2010) (dismissing a claim for tortious interference with business relationships because "Plaintiff fails to identify a single contract or client that it lost as a result of Defendants' alleged actions").

on point. In *iCard*, the plaintiff brought a claim for tortious interference with contractual relationships, alleging that some of its customers had terminated their contracts with the plaintiff, but not alleging that any customers had breached their contracts. *Id.* at *4. The court stated:

> **[I]n a tortious interference with contract case, a plaintiff must allege that the defendant induced a breach of contract.** In this case, iCARD alleges only that certain customers terminated their contracts with iCARD. Termination of a contract and breach of a contract are two different concepts.

*Id.* at *4 (emphasis added). The court granted the defendant's motion to dismiss the claim. *Id.* at *4-*5. *See also Ozark Heartland Elecs., Inc. v. Radio Shack*, 278 F.3d 759, 765 (8th Cir. 2002) (stating, " Missouri law requires a plaintiff to prove a contract was breached as part of his claim of tortious interference" and affirming summary judgment in favor of the defendant because the contract at issue had not been breached but had only been properly terminated); *St. Louis Convention & Visitors Comm'n.*, 154 F.3d at 865 (rejecting the argument that a defendant could be liable for tortious interference without a breach, because such a theory "would be contrary to the Missouri requirement that a plaintiff prove that the defendant induce a breach of contract").

Similarly, the failure to identify any business relationship that has been breached or terminated defeats a tortious interference with business expectancy claim. In *Schoedinger v. United Healthcare*, No. 4:07CV904SNLJ, 2011 WL 97735 (E.D. Mo. Jan. 12, 2011), plaintiff physicians brought a tortious interference with business expectancy claim against a defendant health insurer, claiming that the defendant had interfered with the plaintiffs' business expectancies with their patients. *Id.* at *7. The court granted the defendant's motion to dismiss, stating:

> [T]here is no allegation whatsoever, or any factual basis provided showing that any patient of the plaintiffs breached their contract to pay the plaintiffs or terminated their business relationship with the plaintiffs . . . **Failing to allege whether [defendant's] actions caused any identified patient to terminate**

**his/her business relationship with the plaintiff is fatal to the plaintiffs' cause of action.**

*Id.* (emphasis added). *See also Williams v. Finck & Assocs.*, No. 2:09CV63MLM, 2010 WL 1992242, at *8 (E.D. Mo. May 18, 2010) (dismissing a claim for tortious interference with a contract or business relationship because "Plaintiff does not specify the names of employers who allegedly refused to hire him because of Defendant's conduct"); *U.S. Bank Nat'l Assoc. v. Parker*, No. 4:09CV1755 HEA, 2010 WL 2735661, *4 (E.D. Mo. July 9, 2010) (dismissing claims for tortious interference because general allegations that defendant interfered with plaintiff's relationships by directly or indirectly attempting to induce unidentified clients to sever their business relationship with plaintiff are too broad and conclusory to maintain a claim for tortious interference with a business expectancy).

As in the above cases, the Amended Complaint is completely devoid of any allegation that any of Meritain's contracts or business relationships have been breached or terminated as a result of ESI's actions. Plaintiffs claim that ESI has disparaged their services and prices, undercut Meritain by offering lower prices to its customers, and solicited a direct relationship with Meritain's clients.[57] However, Meritain does *not* allege that any of those actions have caused any of Meritain's clients to terminate contractual relationships with Meritain, nor does Meritain allege that such a termination would constitute a breach of a contract or business expectancy. Therefore, Meritain has failed to allege one of the essential elements of its tortious interference claim.[58] Meritain has failed to state a claim for tortious interference and Count III must be dismissed.

---

[57] Am. Compl. at ¶¶ 85, 87.

[58] Meritain's tortious interference claims would fail even if Meritain had alleged breach because the only "improper" means alleged is use of pricing and other information acquired under the PDPA to submit cost comparisons and proposals to third-parties. Am. Compl. at ¶¶ 86-87. Because ESI has an express legal right to use information it acquired under the PDPA to provide cost analyses and comparisons to third-parties, such use could not be improper.

## IV. SW's claims for breach of contract (Count V) and breach of the covenant of good faith and fair dealing (Count VI) are fatally defective.

In Counts V and VI, SW alleges that ESI has breached the PDPA and the covenant of good faith and fair dealing by "soliciting direct relationships with customers" and using confidential and proprietary pricing and other information ESI allegedly obtained under the PDPA, for price proposals and other business purposes of ESI.[59]

While the Amended Complaint attaches the PDPA (*see* Am Compl. Exhibit 1), Count V does not specifically identify which provision of the PDPA was allegedly breached. This alone is fatal to SW's breach of contract claims. Separate and apart from the obvious pleading defects, SW's breach theories (both breach of contract and breach of the implied covenant) fail because they contradict the PDPA's express terms.

### *A. SW's breach of contract claims should be dismissed for failure to state a claim, because they do not comply with the Twombly pleading standard.*

SW's conclusory allegations that ESI has breached its contractual obligations fails, because SW's Amended Complaint fails to specifically identify (1) what specific contractual provisions are at issue in its claim for breach of contract; and, (2) how ESI allegedly breached these provisions. Under modern federal pleading standards, a plaintiff alleging breach of contract must plead facts plausibly suggesting specific contractual obligations that have allegedly been breached, and the conduct that constituted the alleged breach. SW fails to do so.

SW "must allege the terms of the contract and what obligations the parties owed to one another under the contract." *Alston v. Massachusetts*, 661 F.Supp. 2d 117, 124 (D. Mass. 2009);

---

*See infra.* at pp. 29-33. Indeed, "no liability arises if the defendant had an unqualified legal right to do the act complained of." *Nazeri v. Mo. Valley Co*., 860 S.W.2d 303, 317 (Mo. 1993) (affirming dismissal of tortious interference claims); *see also Universal Electric Prods. Co. v. Emerson Electric Co.*, 386 F. App'x 548 (6th Cir. 2010) (applying Missouri law and rejecting tortious interference claims because "[w]ithout breaching the Agreement, Emerson could not have employed improper means, and thus could not have tortuously interfered with UEP's business relationships."). The same is true here.

[59] *Id*. at ¶¶ 109-110; 117-118.

*see also Bissessur v. Indiana University Board of Trustees*, 581 F.3d 599 (7th Cir. 2009) (*Twombly* teaches that "a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail . . . to indicate that the plaintiff has a substantial case.") (emphasis added).

The leading case in this district is Judge Shaw's opinion in *Icard Stored Value Solutions, LLC, supra*. There, the complaint alleged that the Bank had "'refused to perform under the agreed terms,' which are not stated." Judge Shaw held that these "vague references" were "not sufficient factual allegations to meet the *Twombly* standard":

> Although Count I may include reference to all of the general elements of a breach of contract claim, it fails to allege sufficient facts respecting those elements to establish the grounds on which the claim rests. iCARD's vague references to "certain services" and "certain information" are not sufficient factual allegations to meet the *Twombly* standard.

*Id.* at *2; *accord*, *Skillington v. Activant Solutions, Inc.*, 2009 WL 1588280 at *6 (E.D. Mo. June 5, 2009) ("[p]laintiff has not alleged facts which affirmatively and/or plausibly suggest that he has a right to recover commissions pursuant to an express contract"); *Midwest Special Surgery, P.C. v. Anthem Ins. Cos.*, 2010 WL 716105 (E.D. Mo., Feb. 24, 2010) (dismissing breach of contract claim because "Plaintiffs make only vague allegations as to the 'terms' of the alleged contract"); *Collins v. Allstate Indemn. Co.*, 2010 WL 147969 (N.D. Cal. 2010) at *2 (failure to identify "which provision of the insurance policy Allstate is alleged to have breached" does not comply with *Twombly*); *Yapak v. Mass. May Ins. Co.*, 2009 WL 3366464 (D. N.J. 2009) at *1 ("[s]ince Plaintiff has not alleged any facts concerning the terms of the contract or the losses at issue, this Court cannot infer whether the breach of contract claim is plausible").

Judge Autrey's recent decision in *U.S. Bank National Association v. Parker*, No. 4:09-CV-1755-HEA, 2010 WL 2735661 (E.D. Mo. July 9, 2010), is also on point. Plaintiff alleged

that defendant breached obligations under an agreement by soliciting plaintiff's clients and using confidential information including customer names and account information "for the purposes of soliciting, influencing or encouraging Plaintiff's customers to do business with her after she left the employment of plaintiff." *Id*. at *3. Judge Autrey dismissed, explaining that such "vague, albeit intriguing, references are not sufficient factual allegations to meet the *Twombly* standard…Defendant must be given sufficient notice of the basis for this claim…" *Id.*

The same is true here. In Count V, SW fails to identify any provision of the PDPA that prohibits ESI from competing for PBM business opportunities.[60] Nor has SW identified any provision of the PDPA that prohibits ESI from using information it may have acquired under the PDPA for cost analyses, price comparisons, or other business purposes. SW's failure to identify specific contract provisions that could plausibly support its breach of contract claim demands dismissal.

***B. The actual terms of the PDPA expressly permit the conduct at issue, foreclosing any possible claim for breach.***

It is axiomatic that claims for breach of contract, or breach of the covenant of good faith, cannot contradict express contract rights. *See, e.g., Madsen v. Audrian Health Care, Inc*., 297 F.3d 694, 698-9 (8th Cir. 2002) (affirming dismissal of breach of contract because the contract allowed the activity issue); *see also M.M. Silta, Inc. v. Cleveland Cliffs, Inc*., 616 F.3d 872, 877-78 (8th Cir. 2010) (same); *Countrywide Servs. Corp. v. SIA Ins. Co*., 235 F.3d 390, 393 (8th Cir. 2000) (affirming dismissal of breach of duty good faith and fair dealing claims that exceeded the benefit of the express terms of the agreement); *Affordable Communities of Missouri v. EF & A. Capital Corp*., No. 4:11-CV-555-CAS, 2011 WL 3665141, at *7-8 (E.D. Mo. Aug. 22, 2011)

[60] *See, e.g*., Am. Compl. at ¶ 109 (making conclusory allegations that ESI has breached the PDPA by "soliciting 'direct' relationships" when the PDPA only permits ESI "to have no more than an indirect relationship," but failing to identify any contract provision that allegedly supports this theory).

(dismissing breach of contract and good faith and fair dealing claims that exceeded contract obligations).

In this case, Plaintiffs' theories are contradicted by the express terms—and ESI's express rights—under the PDPA. Plaintiffs allege that ESI is improperly "soliciting" PBM clients with pricing proposals that are based on information ESI gained through its relationship with SW under the PDPA. While ESI denies this, even if the proposals were based on data that ESI obtained through the PDPA, the use of that data to provide cost analyses or cost comparisons to third parties could not support a claim. The contract at issue—and incorporated into Plaintiffs' complaint—makes this point clear.

The PDPA is non-exclusive and explicitly grants ESI express "permission" to use the data and information it obtains through the PDPA "**and/or to transfer to third parties**" for "cost analysis, cost comparisons **or other business purposes of ESI**."[61] Plaintiffs' theory that ESI is breaching the PDPA by doing that which the PDPA expressly permits, dooms their claims.[62]

Judge Shaw's analysis in *EF & A. Capital Corp.*, No. 4:11-CV-555-CAS, 2011 WL 3665141, at *7-8 (E.D. Mo. Aug. 22, 2011), is instructive. Plaintiff sued Fannie Mae and others alleging breach of contract and breach of the duty of good faith and fair dealing. Fannie Mae moved to dismiss. In evaluating the motion, Judge Shaw considered the contract at issue, which contradicted plaintiff's theory of breach. The court concluded that as a matter of law neither the

[61] Ex. 2, 2005 PDPA, Section 3.4(c) attached as Ex. A to SW Compl., Ex. 1; Am. Compl. Ex 1; Am. Compl. at ¶ 17 ("The PDPA is non-exclusive, and Meritain utilizes multiple similar relationships for its clients."); Ex. 1, SW Compl. at ¶ 8 ("The PDPA is non-exclusive, and SW has multiple similar relationships.").

[62] Consistent with this "permission," the PDPA does not include any non-solicitation provisions and the only "drug pricing information" that the PDPA defines as "Proprietary Information" is ESI's pricing information. *Id*. at Section 5.2. In Count V (breach of contract) and Count IV (trade secrets), Plaintiffs suggest that a confidentiality obligation may exist based on ***ESI's*** own client set-up forms, which ESI marks as "confidential and proprietary." *See, e.g.*, Am. Compl. at ¶¶ 97; 110. Plaintiffs' theory is nonsensical. In any event, ESI's designations on its documents do not impose obligations on ESI beyond the express terms of the PDPA; which is a fully integrated agreement. Am. Compl. Ex 1, Section 8.4.

contract nor the implied covenant claims could go forward and dismissed the claims. *Id*. In dismissing, the court explained that a party exercising its express contract rights cannot be liable for breach, nor can the covenant of good faith and fair dealing be used to "alter express terms of [an] agreement" or "give rise to new obligations not otherwise contained in a contract's express terms." *Id*. at *11; *see also Comprehensive Care Corp. v. RehabCare Corp.* 98 F.3d 1063, 1066 (8th Cir.1996) (explaining that under Missouri law, the implied covenant of good faith and fair dealing "cannot give rise to new obligations not otherwise contained in a contract's express terms"; citing *Glass v. Mancuso*, 444 S.W.2d 467, 478 (Mo. 1969)); *Heisel v. John Deere Constr. & Forestry Co.*, No. No. 4:07 CV 1712, 2008 WL 53232, at *10 (E.D. Mo. Jan. 2, 2008) (granting motion to dismiss and explaining that the implied covenant cannot be used to "override or contradict [a] contractual right."); *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404 (Mo. Ct. App. 1996) (finding that even if the contract did not permit direct relationships, the implied covenant could not be used to imply a prohibition).

*Universal Electric Products Co. v. Emerson Electric Co.*, 386 F. App'x 548 (6th Cir. 2010) (applying Missouri law), is also directly on point. Universal Electric Products (UEP) and Emerson entered into an agreement under which UEP would be a "non-exclusive" distributor of Emerson products and under which Emerson reserved the right to revise the price of products. *Id.* at 549. Emerson later began making direct sales to UEP customers and increased the prices it charged UEP. *Id.* at 550. In response, UEP filed suit against Emerson. *Id.* at 551.

On appeal, the Sixth Circuit affirmed the grant of summary judgment in favor of Emerson. With respect to UEP's breach of contract claim, the court held "that the Agreement allowed Emerson to make direct sales and to increase its prices, and that Emerson did not,

therefore, breach the Agreement." *Id*. at 552. Moreover, as to UEP's claim for breach of the implied duty of good faith and fair dealing, the court held:

> Finally, UEP argues that even if Emerson's conduct was authorized under the Agreement, its conduct constituted a violation of the implied obligations of good faith and fair dealing inherent in every contract. This duty prevents a contracting party from exercising a right conferred by an agreement 'in a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract.' *Finova Capital Corp. v. Ream,* 230 S.W.3d 35, 45 (Mo. Ct. App. 2007). **But this argument also fails because the implied covenant of good faith cannot displace the parties' actual agreement**. *Schell v. LifeMark Hosps. of Mo.*, 92 S.W.3d 222, 231 (Mo. Ct. App. 2002). In other words, Missouri law does not allow this covenant to be 'an everflowing cornucopia of wished-for legal duties' imposing an obligation not otherwise contained in the contract's terms. *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996) (citing *Glass v. Mancuso,* 444 S.W.2d 467, 478 (Mo. 1969)). **Because the Agreement <u>authorized</u> all of Emerson's actions, its activities failed to interfere with the spirit or benefit of the transaction, and accordingly Emerson did not breach its duty of good faith and fair dealing.**

*Id.* at 552-53 (emphasis added).

The same is true here. SW is attempting to assert breach of contract and implied covenant claims that are inconsistent with the express terms of the PDPA. SW's claims are based on allegations that ESI is allegedly prohibited from using or disclosing information it obtains under the PDPA, and that it is prohibited from competing with SW because ESI allegedly has an obligation to "have no more than an 'indirect' relationship" with SW clients." Yet the PDPA is not "exclusive" and specifically grants ESI the right to use data provided to ESI by SW and its clients "for . . . **cost analysis, cost comparisons <u>or other business purposes of ESI</u>**."[63] Even if ESI did use information provided by SW to compete for direct PBM business, that is a "business purpose of ESI" and therefore is within ESI's rights under the agreement. Perhaps the parties could have drafted an exception to the "business purpose" provision that specified that

[63] Ex. 2, PDPA at Section 3.4(c) (emphasis added).

ESI could not use information acquired under the PDPA to compete for PBM business, but they chose not to do so.

SW entered into a non-exclusive agreement, granting ESI express permission to use the data and information it obtained through the PDPA "and/or to transfer to third parties" for "cost analysis, cost comparisons or other business purposes of ESI."[64] Plaintiffs' theory that ESI is breaching the PDPA by doing that which the PDPA **expressly permits**, defies credibility and demands dismissal.

Because SW cannot pursue claims for breach of contract or breach the implied covenant of good faith and fair dealing that are based on obligations contrary to the express terms of the parties' contract, Counts V and VI must be dismissed.

**V. Meritain's claim for alleged "violation of trade secret laws" (Count IV) contradicts the express terms PDPA and must be dismissed.**

Count IV alleges that ESI violated "trade secret laws" when it acquired and used confidential and proprietary information "including specific health care data about the members and their families, and their utilization of health care services and drugs."[65] This claim fails for the same reason that SW's claims for breach fail.

Again, the PDPA defines what SW and ESI considered "Proprietary Information."[66] ESI's "Proprietary Information" is defined as:

> [R]eporting and system applications, (web-based and other media), and system formats, databanks, clinical and formulary management operations and programs and manuals, information concerning Rebates, prescription drug evaluation criteria, drug choice management, drug pricing information, and Participating

---

[64] Ex. 2, 2005 PDPA, Section 3.4(c) attached as Ex. A to SW Compl., Ex. 1; Am Compl. Ex 1. In Section 3.4(b), SW agreed that ESI would not have any "liability or responsibility" related to "the disclosure" and "use" of such data.

[65] Am. Compl. ¶ 96.

[66] *Id*. at Section 5.2; *see also* Meritain Compl. at ¶ 29 (including a partial citation of Section 5.2); Am. Compl. at ¶ 48 (same).

Pharmacy agreements.[67]

SW's "Proprietary Information" is defined as "SW information files, business operations and strategies."[68] Both parties agreed that Proprietary Information would not be used or disclosed to any third party "except as specifically contemplated by" the PDPA, or upon prior written consent.[69]

Contrary to Meritain's "trade secret" theory, the parties **specifically contemplated** that ESI could use "**and/or transfer to third-parties**" any "drug and related medical data collected by ESI or provided to ESI by SW and Clients for research, provider profiling and other databases for benchmarking, drug trend, **cost analysis, cost comparisons or other business purposes of ESI**."[70] The only condition that SW placed on ESI's use of this information was that any individually identifiable protected health information ("PHI") be "de-identified in accordance with HIPAA" prior to its use or disclosure to third-parties.[71] Accordingly, the PDPA expressly gives ESI the right to use the very information Meritain claims that ESI improperly obtained through the PDPA and allegedly had no right to use or disclose.

Notably, in the Amended Complaint Meritain does not disclose **any** particular state trade secret law or statute that it believes has been violated.[72] It cannot. There is no trade secret law

---

[67] *Id*. at Section 5.2(a).

[68] *Id*. at Section 5.2(b).

[69] *Id*.

[70] *Id*. at Section 3.4(c) (emphasis added).

[71] *Id*. (in Section 3.4(b) ESI expressly disclaimed "any liability or responsibility to SW or a Client related to the disclosure to, and use of such claims data."). Neither SW nor Meritain allege that ESI is improperly disclosing PHI in violation of this limitation.

[72] Am. Compl. at ¶ 101 (alleging that "ESI has violated applicable state laws and statutes governing the protection of trade secrets," but failing to identify a single statute or state law that has allegedly been violated).

that would allow Meritain to pursue a claim against ESI under these circumstances.[73] Meritain's purported "trade secret" claim is improper and should be dismissed.

## CONCLUSION

For all of the reasons stated above, ESI respectfully requests that the Court grant ESI's motion and dismiss Plaintiffs' claims with prejudice.

Dated: February 28, 2012

Respectfully Submitted,

**HUSCH BLACKWELL LLP**

By /s/ Thomas M. Dee .
Thomas M. Dee, #30378MO
Christopher A. Smith, #53266MO
Matthew D. Knepper, #61731MO
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105-3441
Phone: 314-480-1500
Facsimile: 314-480-1505

*Attorneys for Defendant Express Scripts, Inc.*

[73] Although Meritain has not stated which "state law and statute" ESI has violated, forty-seven states, including Missouri, follow some form of the Uniform Trade Secrets Act (the "Act"). *See* UNIF. TRADE SECRETS ACT (amended 1985), 14 U.L.A. 26-27 (Table of Enactment, 2010) (showing relevant statutes and enactment date for 45 states); N.J. REV. STAT. § 56:15-1, *et seq.* (enacted 2012); *see also* N.C. GEN. STAT. § 66.152, *et seq.* (North Carolina); *see also* Mo. Rev. Stat. 417.450 to 417.467; *see also* 12 Pa. Cons. Stat. Ann. § 5302. Under the Act, a "trade secret" must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." MO. REV. STAT. 417.453(4)(b). Unlawful misappropriation requires a "knowing" and intentionally improper disclosure. MO. REV. STAT. 417.453(2). Here, the fact that SW granted specific permission for ESI to use the information in the manner now complained is not a "reasonable" effort to protect its secrecy, nor could it support any claim for improper misappropriation. In light of the explicit contract language, Mertain cannot offer any facts which could support a misappropriation claim, and therefore has failed to state a claim upon which relief can be granted. Indeed, courts interpreting the Act recognize that permission to use information cannot be characterized as a misappropriation under the Act. *See BDT Products, Inc. v. Lexmark Int'l, Inc.*, 274 F.Supp.2d 880 (W.D. Ky. 2003) ("Because it is undisputed that the parties repeatedly entered into confidentiality agreements that expressly and unambiguously disclaimed any restrictions on Lexmark's use of information provided by BDT, it is axiomatic that no express or implied duty restricting Lexmark's use of such information can be found here."), *aff'd by BDT Products, Inc. v. Lexmark Intern., Inc.*, 124 Fed.Appx. 329, 331, 2005 WL 351150, 2 (6th Cir. 2005) ("Because the language of the agreements is clear, the understanding of the companies is irrelevant.").

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon Counsel of Record, this 28th day of February 2012, to the addressees shown below:

Frederick P. Santarelli
fps@elliottgreenleaf.com
John M. Elliott
jme@elliottgreenleaf.com
John P. Elliott
jpe@elliottgreenleaf.com
Gregory S. Voshell
gsv@elliottgreenleaf.com
Elliot Greenleaf & Siedzikowski P.C.
Union Meeting Corporate Center V, Suite 300
925 Harvest Drive
P.O. Box 3010
Blue Bell, Pa 19422

Kevin A. Sullivan
ksullivan@ss-law.net
Michael L. Knepper
mknepper@ss-law.net
Sauter Sullivan, LLC
3415 Hampton Avenue
St. Louis, Missouri 63139
Tel: (314) 768-6800
Fax: (314) 781-2726

Daniel Platt
dplatt@loeb.com
Loeb & Loeb, LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, California 90067
Phone: (310) 282-2110

*Attorneys for Plaintiffs Meritain Health, Inc. and Scrip World LLC*